**EDISON ELECTRIC INSTITUTE, et al., Petitioners,**

v.

**U.S. ENVIRONMENTAL PROTECTION AGENCY, Respondent.**

No. 91–1586.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 11, 1992.

Decided June 18, 1993.

Douglas H. Green argued the cause for petitioners. With him on the brief were Mary F. Edgar, James P. Rathvon, and Norman L. Rave, Jr.

Daniel W. Pinkston, Atty., U.S. Dept. of Justice, argued the cause for respondent. With him on the brief were Vicki A. O'Meara, Acting Asst. Atty. Gen. and Michael A. McCord, Atty., U.S. Dept. of Justice, George B. Wyeth, Gen. Counsel, Raymond Ludwiszewski, Acting Gen. Counsel, Steven Pressman, Acting Asst. Gen. Counsel and Lisa K. Friedman, Associate Gen. Counsel, U.S. E.P.A.

Before EDWARDS, BUCKLEY, and D.H. GINSBURG, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

Three national electric utility associations and seventy-three individual power companies petition for review of the Environmental Protection Agency's interpretation of section 3004(j) of the Resource Conservation and Recovery Act, a provision that governs the storage of hazardous wastes. The EPA's interpretation renders it unlawful to store wastes for indefinite periods pending the development of adequate treatment techniques or disposal capacity. Petitioners contend that this interpretation is both inconsistent with the statute and unreasonable as applied to generators of wastes containing both hazardous and radioactive components, for which there are currently few lawful treatment or disposal options. Because we find that the EPA's interpretation is not only permissible, but is in fact mandated by the terms of the statute, we deny the petition.

## I. BACKGROUND

The Resource Conservation and Recovery Act of 1976 ("RCRA") establishes a comprehensive "cradle-to-grave" scheme for regulating hazardous wastes. As amended by the Hazardous and Solid Waste Amendments of 1984 ("HSWA"), the centerpiece of RCRA is an ambitious set of land disposal restrictions ("LDRs"). The LDRs prohibit land disposal of particular wastes as of specified dates unless such disposal is carried out in accordance with regulations issued by the EPA. *See generally Chemical Waste Management, Inc. v. EPA,* 976 F.2d 2, 7–9 (D.C.Cir.1992). For most wastes, land disposal may continue after the applicable deadline only if one of two conditions is met. First, land disposal of a waste is allowable if the EPA concludes, with "a reasonable degree of certainty, that there will be no migration of hazardous constituents from the disposal unit or injection zone for as long as the waste[ ] remain[s] hazardous." 42 U.S.C. § 6924(d)(1). Second, a waste may be land disposed if that waste is treated in accordance with standards established by the EPA. *Id.* § 6924(m)(2). Thus, RCRA directs the EPA to

promulgate regulations specifying those levels or methods of treatment, if any, which substantially diminish the toxicity of the waste or substantially reduce the likelihood of migration of hazardous constituents from the waste so that short-term and

long-term threats to human health and the environment are minimized.

*Id.* § 6924(m)(1).

The provision of RCRA at issue here, section 3004(j), limits the storage of hazardous wastes. It provides:

In the case of any hazardous waste which is prohibited from one or more methods of land disposal under this section (or under regulations promulgated by the Administrator under any provision of this section) the storage of such hazardous waste is prohibited unless such storage is solely for the purpose of the accumulation of such quantities of hazardous waste as are necessary to facilitate proper recovery, treatment or disposal.

*Id.* § 6924(j). Congress enacted this section because it "believed that permitting storage of large quantities of waste as a means of forestalling required treatment would involve health threats equally serious to those posed by land disposal, and therefore opted in large part for a 'treat as you go' regulatory regime." *Hazardous Waste Treatment Council v. EPA,* 886 F.2d 355, 357 (D.C.Cir.1989) (*"HWTC III"*).

At issue in the present case is the application of section 3004(j) and the EPA's implementing regulations to "mixed wastes." Mixed wastes are wastes that contain both a hazardous waste component regulated under RCRA and a radioactive waste component regulated under the Atomic Energy Act ("AEA"). *See State Authorization To Regulate the Hazardous Components of Radioactive Mixed Wastes Under the Resource Conservation and Recovery Act,* 51 Fed.Reg. 24,504 (1986) (announcing the EPA's determination "that wastes containing both hazardous waste and radioactive waste are subject to the RCRA regulation"); *New Mexico v. Watkins,* 969 F.2d 1122, 1132 (D.C.Cir. 1992) (deferring to the EPA's conclusion that RCRA applies to mixed wastes). These wastes are generated by nuclear power plants, as well as by universities, research institutions, hospitals, and industrial facilities. At the present time, adequate treatment methods have not been developed, and there is a severe shortage of disposal capacity for mixed wastes. As a result, generators have turned to storing these wastes as their only available option short of ceasing their operations or engaging in illegal disposal practices.

The EPA issued regulations to implement section 3004(j) in 1986. *See Hazardous Waste Management System; Land Disposal Restrictions,* 51 Fed.Reg. 40,572, 40,579, 40,-642–43 (1986). Reiterating the statutory language, the regulations provided that generators were permitted to store hazardous wastes subject to the LDRs in "tanks or containers on-site" if such storage was "solely for the purpose of the accumulation of such quantities of hazardous waste as necessary to facilitate proper recovery, treatment, or disposal...." 40 C.F.R. § 268.50(a)(1) (1992). The regulations also established a burden-shifting scheme for determining when storage would be viewed as "solely for the purpose of the accumulation of such quantities of hazardous waste as necessary to facilitate proper recovery, treatment, or disposal." Specifically, the regulations provided:

(b) An owner/operator of a treatment, storage or disposal facility may store such wastes for up to one year unless the Agency can demonstrate that such storage was not solely for the purpose of accumulation of such quantities of hazardous waste as are necessary to facilitate proper recovery, treatment, or disposal.

(c) A[n] owner/operator of a treatment, storage or disposal facility may store such wastes beyond one year; however, the owner/operator bears the burden of proving that such storage was solely for the purpose of accumulation of such quantities of hazardous waste as are necessary to facilitate proper recovery, treatment, or disposal.

*Id.* § 268.50(b), (c); *see also HWTC III,* 886 F.2d at 366–68 (upholding the 40 C.F.R. § 268.50(b) presumption that storage for less than one year is for permissible purposes).

As part of its November 22, 1989, proposed rule establishing disposal and treatment standards for certain wastes, known as "Third Third" wastes because they fell into the last of three groups of wastes to be

regulated under the LDR program, the EPA sought comments on its existing approach and possible alternatives for implementing section 3004(j). *See Land Disposal Restrictions for Third Scheduled Wastes,* 54 Fed. Reg. 45,372, 48,496 (1989). At the outset, the EPA noted that "[t]he intent of RCRA section 3004(j) and 40 C.F.R. § 268.50 is to prohibit use of long-term storage to circumvent treatment requirements imposed by the LDRs." *Id.* The EPA then observed that, although the existing regulations did not establish a "firm time limit" for storage of hazardous wastes, they had produced "concerns that some legitimate storage technically may be prohibited...." *Id.* Thus, the EPA announced that it was

> ... requesting comment on alternative approaches for prohibiting storage. Under one alternative, where prohibited wastes are stored in tanks or containers pending the utilization of proper treatment, recovery or disposal capacity, the storage would not be prohibited. Two examples of allowable storage under this alternative approach are provided below:
>
> (1) Where a generator is storing wastes in tanks for six weeks because of a backup at an incinerator which the generator has a contract to use; and
>
> (2) Where a treatment facility treats a prohibited waste to a level that does not meet the treatment standard and then stores the waste before treating it again to meet the standard.
>
> EPA is soliciting views on these issues today because a literal reading of the statute would likely condemn such storage as unlawful. This is because the statutory language and 40 CFR § 268.50 draw a connection between the amount of waste being stored and the purpose of facilitating proper management. Virtually no storage except that undertaken to promote underutilized proper management capacity would satisfy this literal reading of the statute.
>
> . . . .
>
> Accordingly, EPA is soliciting comment on the alternative interpretation (*i.e.* that the storage prohibition only applies if storage is surrogate disposal, for example due to failure to utilize existing treatment capacity, or if storage is otherwise undertaken for purposes of evading a land disposal prohibition). Commentators should also address other potential situations where they believe that an overly literal reading of section 3004(j) may have consequences they believe Congress did not intend.

*Id.*

In response to this solicitation, the EPA received a number of comments supporting alternative approaches to implementing section 3004(j). Nevertheless, in the preamble to the final Third Third rule issued on June 1, 1990, the EPA announced that it had decided not to pursue a "definitive reinterpretation" of the storage provision. *Land Disposal Restrictions for Third Third Scheduled Wastes,* 55 Fed.Reg. 22,520, 22,534 (1990). The EPA emphasized that it

> continues to believe ... that the statutory prohibition was designed to prevent the use of storage as a means of avoiding a treatment standard, and will continue to enforce the storage prohibition with that intention in mind.

*Id.* It concluded, however, that revising the regulation would result in a rule that would "be very difficult to implement and enforce." *Id.* at 22,672. Despite its decision not to undertake a comprehensive revision of the regulation, the EPA did note the special problems faced by generators of mixed wastes. *See id.* at 22,534, 22,673. The EPA stated that it would "further evaluate the legal, policy, and factual issues relevant to this matter" and "issue its policy on the mixed waste storage issue during the next 90 days." *Id.* at 22,673.

More than a year later, on August 29, 1991, the EPA issued a statement of its enforcement policy with respect to the storage of mixed wastes. *See Policy on Enforcement of RCRA Section 3004(J) Storage Prohibition at Facilities Generating Mixed Radioactive/Hazardous Wastes,* 56 Fed.Reg. 42,730 (1991) ("Enforcement Policy Statement"). In the Enforcement Policy Statement, the EPA noted that it had "previously concluded that storage of a waste pending development of treatment capacity does not

constitute storage to accumulate sufficient quantities to facilitate proper treatment or disposal." *Id.* at 42,732. As a result, the Agency recognized that "[g]enerators and storers of [mixed] wastes may find it impossible to comply with the section 3004(j) storage prohibition" because of a lack of available treatment and disposal options. *Id.* at 42,-731; *see also id.* at 42,733 ("Without available treatment or disposal capacity for many mixed wastes, generators of these wastes are faced with little choice but to violate the LDR storage prohibition...."). The EPA announced, however, that for those mixed waste generators who "are operating their storage facilities in an environmentally responsible manner," violations of section 3004(j) would be considered "reduced priorities among EPA's potential civil enforcement actions." *Id.* at 42,731. The EPA noted that this enforcement policy would terminate on December 31, 1993, or at an earlier date "[i]f sufficient, lawful treatment capacity becomes available." *Id.*

## II. DISCUSSION

Petitioners contend that the EPA's interpretation of the storage provision, as articulated in its Enforcement Policy Statement, is both inconsistent with the statute and unreasonable. Before reaching the merits, however, it is necessary to consider several threshold issues raised by the EPA, which seeks dismissal of the petition for review.

### A. Jurisdiction and Justiciability

#### 1. *Timeliness of the Petition for Review*

■ The EPA argues that this court is without jurisdiction to consider the petition for review because it was not timely filed. Under section 7006(a)(1) of RCRA,

> a petition for review of action of the Administrator in promulgating any regulation, or requirement under this chapter or denying any petition for the promulgation, amendment or repeal of any regulation under this chapter ... shall be filed within ninety days from the date of such promulgation or denial, or after such date if such petition for review is based solely on grounds arising after such ninetieth day....

42 U.S.C. § 6976(a)(1). Here, the petition for review was filed within ninety days of the EPA's Enforcement Policy Statement. The EPA contends, however, that petitioners are effectively challenging the preexisting section 3004(j) regulations, provisions that were initially promulgated in 1986 and for which the ninety-day filing period has long since expired.

■ Filing periods such as the ninety-day window established by section 7006(a)(1) are "jurisdictional in nature, and may not be enlarged or altered by the courts." *Natural Resources Defense Council v. NRC,* 666 F.2d 595, 602 (D.C.Cir.1981). Nevertheless, "the period for seeking judicial review may be made to run anew when the agency in question by some new promulgation creates the opportunity for renewed comment and objection." *Ohio v. EPA,* 838 F.2d 1325, 1328 (D.C.Cir.1988). Thus, in *Association of American Railroads v. ICC,* 846 F.2d 1465 (D.C.Cir.1988) ("*American Railroads*"), the Interstate Commerce Commission proposed new regulations to supplement existing rules, but also announced that it intended to "harmonize" its divergent approaches to similar regulatory problems. *Id.* at 1473. The court took this statement as a suggestion "that the search for harmony might lead to a rethinking of old positions," *id.,* and held that the new proposal restarted the applicable sixty-day limit for seeking review of Commission regulations. According to the court, "if the agency has opened the issue up anew, even though not explicitly, its renewed adherence is substantively reviewable." *Id.*

Similarly, in *Ohio v. EPA,* the EPA published proposed rules in 1985 regarding private claims against the Superfund. *See* 838 F.2d at 1327–28. These proposed rules included certain regulations that the agency had initially enacted in 1982. *See id.* Although the EPA explicitly sought comment only on the new provisions, it "explained the unchanged but republished portion of the regulation ... in general policy terms and responded to at least one comment" directed at the 1982 rules. *Id.* at 1328 (citation omitted). The court held that these actions reopened the filing period so that a petition for

review of the 1982 rules was timely filed. *See id.* at 1328–29.

We find that the "reopener doctrine" articulated in cases such as *American Railroads* and *Ohio v. EPA* plainly governs the present dispute, and hence that the petition was timely filed. By soliciting comments on the existing section 3004(j) regulations and advancing a possible "alternative approach" in the proposed Third Third rule, the EPA clearly provided the type of "opportunity for renewed comment and objection" that suffices to restart the statutory period for seeking review. Indeed, petitioners are in a considerably stronger position than the petitioners in both *American Railroads* and *Ohio v. EPA*. In neither of those cases did the agency explicitly propose reconsideration of or request comments on the precise regulatory provision challenged in the petition for review. *See Public Citizen v. NRC,* 901 F.2d 147, 151 (D.C.Cir.1990) (holding that the NRC's decision to reconsider in 1988 a policy that was initially promulgated in 1985 reopened the statutory period for seeking review, and commenting that "[t]he evidence of reopening is ... much stronger than required by our prior cases, for the Commission did not merely implicitly reexamine its former choice; it did so explicitly").

■ In an attempt to avoid the conclusion that the reopener doctrine applies, the EPA observes that it did not republish its section 3004(j) regulations, nor did it propose specific language to replace or modify them. That such measures are not required to restart the statutory review period, however, is clear from *American Railroads.* The EPA also cites this court's decision in *American Iron & Steel Institute v. EPA,* 886 F.2d 390, 397–98 (D.C.Cir.1989). In that case, we considered a proposed RCRA rule issued by the EPA in 1987 which mentioned a policy regarding "post-closure permits and permits by rule" that had been enacted in 1985. *See id.* at 397–98. Although the EPA did not explicitly reopen the question of whether such permits should be treated as RCRA permits, the Agency received some comments on the matter and responded briefly to them by reaffirming its position in the final rule. *Id.* at 398. We held that the Agency's action did

not restart the statutory period for challenging the EPA's 1985 regulation, remarking that "[t]he 'reopening' rule of *Ohio v. EPA* is not a license for bootstrap procedures by which petitioners can comment on matters other than those actually at issue, goad an agency into a reply, and then sue on the grounds that the agency had re-opened the issue." *Id.* The present case, however, is readily distinguished. Because the EPA explicitly invited comments on the precise question for which petitioners now seek review, this case cannot be fairly characterized as one in which petitioners "comment[ed] on matters other than those actually at issue, goad[ed the] agency into a reply, and then sue[d] on the grounds that the agency had re-opened the issue."

The EPA's final argument is that even if the request for comment in the proposed Third Third rule did reopen the issue, the ninety-day period for seeking review began to run from the date of the final Third Third rule announcing that the EPA would retain its original interpretation of section 3004(j), rather than from the date of the Enforcement Policy Statement. We disagree. In the final rule, the EPA stated that it would "further evaluate the legal, policy, and factual issues" relating to the storage of mixed wastes, 55 Fed.Reg. at 22,673, and that it expected "to issue its policy on the mixed waste storage issue during the next 90 days." *Id.* These statements clearly indicated that the EPA had not yet reached a final position with respect to the storage of mixed wastes. Moreover, the Agency admitted as much in the Enforcement Policy Statement by commenting that "[i]n the final rule ... the Agency ... affirmed the strict interpretation of the storage prohibition, while *leaving open* the possibility of developing another position on the mixed waste storage issue." 56 Fed. Reg. at 42,732 (emphasis added). Certainly, it was reasonable for petitioners to rely on the EPA's representations by forebearing from seeking judicial review until after the Enforcement Policy Statement was issued. Indeed, any petition for review filed prior to the Enforcement Policy Statement would likely have been dismissed as premature.

2. *Reviewability of the EPA's Enforcement Policy*

■ The EPA next argues that its Enforcement Policy Statement is immune from review under *Heckler v. Chaney*, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985). In *Heckler*, the Supreme Court determined that "an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." *Id.* at 831, 105 S.Ct. at 1655. As a result, the Court concluded that such decisions are "presumptively unreviewable" under section 701(a)(2) of the Administrative Procedure Act. *Id.* at 832, 105 S.Ct. at 1656.

We find the EPA's *Heckler* argument unconvincing. Petitioners are not challenging the manner in which the EPA has chosen to exercise its enforcement discretion. Indeed, as petitioners point out, "[i]f [they] agreed with the Agency's interpretation of section 3004(j), [they] would obviously *support* the enforcement policy because it places a low priority on enforcing the storage prohibition against generators of mixed waste...." Petitioners' Reply Br. at 6 n. 3 (emphasis in original). Instead, petitioners are challenging the EPA's interpretation of section 3004(j) and its implementing regulations. Under the EPA's interpretation, it is unlawful to store mixed wastes indefinitely pending the development of adequate treatment capacity. Clearly, this interpretation has to do with the substantive requirements of the law; it is not the type of discretionary judgment concerning the allocation of enforcement resources that *Heckler* shields from judicial review. *Cf. International Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock*, 783 F.2d 237, 245–46 (D.C.Cir.1986) (holding that "[n]othing in ... the holding or policy of *Heckler v. Chaney* [ ] precludes review of a proper plaintiff's timely challenge of an agency's announcement of its interpretation of a statute," even when that interpretation is advanced in the context of a decision not to take enforcement action).

3. *Ripeness*

■ The final argument offered by the EPA to bar consideration of the merits is that the case is not ripe for review. Under the two-pronged test developed in *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), a court assessing whether a case is ripe must consider "[1] the fitness of the issues for judicial decision and [2] the hardship to the parties of withholding court consideration." *Id.* at 149, 87 S.Ct. at 1515.

Turning first to the "fitness" prong, we find it dispositive that Congress has affirmatively expressed a preference for prompt review of RCRA regulations by establishing a ninety-day window for filing challenges. *See Mountain States Tel. & Tel. Co. v. FCC*, 939 F.2d 1035, 1040 (D.C.Cir.1991); *National Recycling Coalition, Inc. v. Reilly*, 884 F.2d 1431, 1434 (D.C.Cir.1989); *Eagle–Picher Indus., Inc. v. EPA*, 759 F.2d 905, 916, 918 (D.C.Cir.1985). Indeed, the present case is on all fours with our 1989 decision in *National Recycling Coalition*. In that case, the court held ripe a challenge to the EPA's regulations governing the purchase of recycled paper and paper products by government agencies. *See National Recycling Coalition*, 884 F.2d at 1434. The court emphasized that the petition for review was filed within the ninety-day period established by section 7006(a)(1) of RCRA, 42 U.S.C. § 6976(a)(1), and accordingly concluded "that judicial review at this time is ... statutorily required." *National Recycling Coalition*, 884 F.2d at 1434.

To be sure, this court has indicated that a challenge filed within the statutory period might not be considered "fit for judicial decision" when there are clear and significant institutional benefits to be derived from postponing review. *See, e.g., Mountain States*, 939 F.2d at 1040; *Natural Resources Defense Council, Inc. v. EPA*, 859 F.2d 156, 167 (D.C.Cir.1988). No such benefits are apparent in the present case, and, in fact, all of the relevant factors weigh in favor of immediate review.

First, the petition for review presents a "purely legal question." *See, e.g., Eagle–Picher*, 759 F.2d at 915, 916. In its Enforcement Policy Statement, the EPA reaffirmed its position that storage of mixed wastes "pending development of treatment capacity"

constitutes a violation of section 3004(j) and 40 C.F.R. § 268.50. *See* 56 Fed.Reg. at 42,-732. Petitioners simply ask the court to determine whether this interpretation represents a permissible reading of the statute.

Second, the EPA's position on the application of section 3004(j) to the storage of mixed wastes clearly "represents its final word on the subject, i.e. its policy has crystallized." *American Railroads*, 846 F.2d at 1469. Thus, engaging in review will not "waste[ ] the court's time," nor will it prematurely interrupt the EPA's decision-making process. *See Eagle–Picher*, 759 F.2d at 917 (quoting *Continental Air Lines, Inc. v. CAB*, 522 F.2d 107, 125 (D.C.Cir.1974)).

Third, the court's deliberations are unlikely to be aided by application of the EPA's interpretation to a particular set of facts. *Cf. Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158, 163–64, 87 S.Ct. 1520, 1524, 18 L.Ed.2d 697 (1967) (acknowledging that a challenge to an agency regulation presented a "purely legal question," but finding the matter unripe, in part because "judicial appraisal of [the relevant] factors is likely to stand on a much surer footing in the context of a specific application of this regulation than could be the case in the framework of the generalized challenge made here"). Petitioners are making a "wholly legal and facial" challenge to an EPA policy that applies "across the board" to mixed waste generators, all of whom share a common problem—a severe shortage of adequate treatment and disposal capacity. *See Mountain States*, 939 F.2d at 1040–41. Accordingly, there is little to be gained through "consideration of ... particularized facts." *Id.* at 1041.

Finally, the present case cannot be characterized as one in which "resolution of the dispute is likely to prove unnecessary" if the court elects to defer review. *State Farm Mut. Auto. Ins. Co. v. Dole*, 802 F.2d 474, 479 (D.C.Cir.1986); *see also Friends of Keeseville, Inc. v. FERC*, 859 F.2d 230, 235 (D.C.Cir.1988) (finding a question not ripe for review in a case in which "[t]he central judicial interest in deferring resolution ... lies in the possibility that if the issue is not adjudicated at this time, it may not require adjudication at all"). It is true that the EPA

has declared, in effect, that it does not intend to enforce its interpretation of section 3004(j) against mixed waste generators. *See* 56 Fed. Reg. at 42,731. The EPA admits, however, that its own enforcement policy cannot bind state enforcement efforts, *see id.*, nor does it limit private actions under RCRA's citizen suit provision, *see* 42 U.S.C. § 6972(a)(1)(A). To the extent that the EPA's interpretation of section 3004(j) is likely to be an issue in such suits, one is "left with the overpowering sense that if the question is not adjudicated at this time, it will be in the not-too-distant future." *TRT Telecommunications Corp. v. FCC*, 876 F.2d 134, 140 (D.C.Cir.1989); *see also Mountain States*, 939 F.2d at 1041.

Having concluded that the petition for review was filed within the ninety-day period and that there are no institutional interests weighing against review, it is unnecessary to evaluate the second prong of the *Abbott Laboratories* ripeness test, the hardship the parties would experience if review were withheld. *See National Recycling Coalition*, 884 F.2d at 1434.

### B. The Merits

 Because the EPA has been entrusted to administer RCRA, review of the EPA's interpretation of section 3004(j) is governed by the familiar two-step test articulated in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984). Accordingly, we first ask "whether Congress has directly spoken to the precise question at issue." *Id.* at 842, 104 S.Ct. at 2781. In making this determination, "the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291, 108 S.Ct. 1811, 1818, 100 L.Ed.2d 313 (1988). If we find that "the statute is silent or ambiguous with respect to the specific issue," we must uphold the EPA's interpretation as long as it represents "a permissible construction of the statute." *Chevron*, 467 U.S. at 843, 104 S.Ct. at 2782.

In the present case, we agree with the EPA that Congress has spoken to the precise question at issue, and that section 3004(j)

cannot be read to sanction the indefinite storage of potentially unlimited amounts of mixed wastes while treatment methods or disposal capacity is being developed. Turning first to the statutory language, section 3004(j) provides that storage of hazardous wastes covered by the LDRs is prohibited "unless such storage is solely for the purpose of the accumulation of such quantities of hazardous waste as are necessary to facilitate proper recovery, treatment or disposal." 42 U.S.C. § 6924(j). Petitioners argue that this language supports their position by claiming that "when there is no capacity available to recover, treat, or dispose of an LDR waste (as in the case of mixed waste), the *only* means available to 'facilitate proper recovery, treatment or disposal' is to accumulate and store the waste until qualified treatment or disposal capacity becomes available." Petitioners' Br. at 29 (emphasis in original).

The problem with this interpretation is that it effectively reads fifteen words—"solely for the purpose of the accumulation of such quantities of hazardous waste as are"—out of section 3004(j). *Cf. Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana,* 472 U.S. 237, 249, 105 S.Ct. 2587, 2594, 86 L.Ed.2d 168 (1985) (noting "the elementary canon of construction that a statute should be interpreted so as not to render one part inoperative") (quoting *Colautti v. Franklin,* 439 U.S. 379, 392, 99 S.Ct. 675, 684, 58 L.Ed.2d 596 (1979)); *see also Illinois Commerce Comm'n v. ICC,* 879 F.2d 917, 926–27 (D.C.Cir.1989). We find instead that by linking the "accumulation of such quantities" with the purpose of "facilitat[ing]" proper waste management, the statute authorizes storage only when it is intended to build up an amount of waste that can be readily transported, treated, or disposed—as, for example, when storage is used to meet minimum volume requirements imposed by waste transporters or treatment facilities.

To the extent that the statutory language leaves any doubt, it evaporates when one considers the "design of the statute as a whole." *K Mart,* 486 U.S. at 291, 108 S.Ct. at 1818. In particular, RCRA includes provisions that are specifically intended to deal with the problem of inadequate treatment or disposal capacity. Section 3004(h)(2) of RCRA provides that the EPA may grant national capacity variances under which particular wastes would not be subject to the LDRs for up to two years. 42 U.S.C. § 6924(h)(2). In addition, section 3004(h)(3) provides that the EPA may grant further extensions "on a case-by-case basis" from an applicable LDR effective date for up to one year, and may renew these extensions for an additional year. *Id.* § 6924(h)(3). The fact that Congress has explicitly provided a statutory mechanism to deal with the contingency of inadequate treatment or disposal capacity weighs heavily against a reading of section 3004(j) that would permit storage to become an alternative avenue for dealing with such shortages.

More broadly, the EPA's interpretation of section 3004(j) is consistent with RCRA's status as a highly prescriptive, technology-forcing statute. As amended in 1984 by the HSWA, RCRA was clearly intended to provide draconian incentives—such as the prohibition of all forms of land disposal for specified wastes—for the rapid development of adequate treatment and disposal capacity. These incentives would be significantly diminished to the extent that generators could rely on the possibility of storing their wastes indefinitely in the event that capacity was not developed in a timely fashion. Indeed, we find it difficult to imagine that Congress would leave such a glaring loophole in the system of incentives it created to promote the development of new treatment and disposal technologies.

Not surprisingly, petitioners characterize RCRA's purpose in a different fashion. Specifically, they contend that the primary goal of the statute is to prevent land disposal of untreated wastes. They then argue that storage of mixed wastes pending the development of treatment capacity furthers this goal by ensuring that such wastes will eventually be treated prior to disposal. This argument, however, is flawed by petitioners' incomplete characterization of the statutory purpose. To be sure, Congress did intend to minimize the land disposal of untreated wastes, *see* 42 U.S.C. § 6902(a)(6), but it sought to accomplish this objective within the context of a

" 'treat as you go' regulatory regime," *HWTC III*, 886 F.2d at 357, and to encourage the quickest possible transition to such a regime.

Petitioners make several other arguments to support their position that section 3004(j) authorizes the indefinite storage of mixed wastes, or at the very least, that the statute is ambiguous. Most prominently, petitioners stress that the EPA's interpretation of section 3004(j) imposes requirements that are impossible for mixed waste generators to meet. According to petitioners, even if generators were to cease their operations entirely—an action that would entail massive disruption of the national economy—they would remain in violation with respect to mixed wastes that have already been generated and wastes that would be produced during the shutdown process. Petitioners contend that statutory constructions yielding such "absurd" or "impossible" results are to be avoided.

There are two responses to petitioners' "impossibility" argument. As an initial matter, the impossibility of compliance with section 3004(j) emerges only if one adopts petitioners' *ex post* perspective on the statute. That is, petitioners look only at the situation as it stands currently, after the relevant LDR deadlines have passed. Given the technology-forcing nature of the statute, however, it is more reasonable to adopt an *ex ante* view and ask whether, if sufficient resources were devoted to the problem, it was possible to develop the required treatment and disposal technologies between 1986, when it became clear that RCRA applied to mixed wastes, and the present.

Moreover, even though it may have proven impossible for generators to develop the required treatment and disposal options within the statutory period, courts have not shrunk from adopting onerous interpretations of statutory provisions where required by the clear intent of Congress. Indeed, in two of the cases cited prominently by petitioners, the Supreme Court ultimately upheld purportedly "absurd" statutory constructions on precisely this ground. *See Commissioner v. Asphalt Products Co.*, 482 U.S. 117, 121, 107 S.Ct. 2275, 2278, 96 L.Ed.2d 97 (1987) ("Judicial perception that a particular result would be unreasonable may enter into the construction of ambiguous provisions, but cannot justify disregard of what Congress has plainly and intentionally provided."); *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575–76, 102 S.Ct. 3245, 3252, 73 L.Ed.2d 973 (1982).

The next argument advanced by petitioners is based on the legislative history of section 3004(j). Petitioners note that the section was originally enacted as part of a package of amendments introduced by Representative Breaux. In a section-by-section analysis of his amendments, Representative Breaux stated that the "purpose" of section 3004(j) was "to avoid the potential problem of waste generators, handlers or disposers utilizing 'sham' storage to avoid a prohibition on the disposal of a particular waste from one or more methods of land disposal." 129 Cong. Rec. at 27,666 (Oct. 6, 1983). Relying on this statement, petitioners contend that storage of mixed wastes while treatment or disposal capacity is being developed cannot be construed as a "sham," and hence that such storage does not run afoul of section 3004(j).

Petitioners' argument presents a classic example of the selective use of legislative history. In particular, petitioners ask us to ignore the floor statement of Representative Forsythe, who "worked very closely with" Representative Breaux in developing the package of amendments that included section 3004(j). *Id.* Representative Forsythe remarked that under section 3004(j), "[s]torage based only on some vague hope for a future development of appropriate treatment is no longer acceptable," *id.* at 27,669, a statement that appears to apply directly to the situation in which mixed waste generators now find themselves. But more to the point, "[u]nless exceptional circumstances dictate otherwise, '[w]hen we find the terms of a statute unambiguous, judicial inquiry is complete.' " *Burlington Northern R.R. v. Oklahoma Tax Comm'n*, 481 U.S. 454, 461, 107 S.Ct. 1855, 1860, 95 L.Ed.2d 404 (1987) (quoting *Rubin v. United States*, 449 U.S. 424, 430, 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981)); *see also American Mining Congress v. EPA*, 824 F.2d 1177, 1190 (D.C.Cir.1987) (quoting *Burlington*). Petitioners' lone snippet of legislative history hardly qualifies as an "exceptional circumstance."

Petitioners also contend that the EPA's interpretation of section 3004(j) contravenes section 1006(a) of RCRA, which provides that "[n]othing in this chapter shall be construed to apply to ... any activity or substance which is subject to ... the Atomic Energy Act of 1954 [42 U.S.C. 2011 et seq.] except to the extent that such application ... is not inconsistent with the requirements of such Act[ ]." 42 U.S.C. § 6905(a). Petitioners, however, are unable to point to any direct conflict between the EPA's position and any specific provision of the AEA. As a result, petitioners are relegated to the generalized claim that the Agency's interpretation interferes with the "primary purpose" of the AEA, "the promotion of nuclear power." *Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n*, 461 U.S. 190, 221, 103 S.Ct. 1713, 1731, 75 L.Ed.2d 752 (1983). It is true that the AEA was intended to foster the development of nuclear power, *see id.*, and that the EPA's interpretation of section 3004(j) will impose additional burdens on nuclear power generators. Nevertheless, the Supreme Court has made it clear that "the promotion of nuclear power is not to be accomplished 'at all costs,'" *id.* at 222, 103 S.Ct. at 1732, and burdens such as those imposed by the EPA's interpretation are to be expected in the dual scheme of regulation of mixed wastes that this court has already sanctioned. *See New Mexico v. Watkins*, 969 F.2d at 1130–32.

Finally, we reject petitioners' suggestion that the EPA's explicit consideration of an alternative approach to interpreting section 3004(j) indicates that the statute is ambiguous. The EPA did solicit comments on a more lenient approach to implementing section 3004(j), but the alternative advanced by the EPA was not nearly so broad as to contemplate the indefinite storage of potentially unlimited amounts of wastes pending the development of adequate treatment and disposal capacity. In this regard, it is instructive to examine the two examples of the types of storage that the EPA suggested would be authorized under its alternative approach:

(1) Where a generator is storing wastes in tanks for six weeks because of a backup at an incinerator which the generator has a contract to use; and

(2) Where a treatment facility treats a prohibited waste to a level that does not meet the treatment standard and then stores the waste before treating it again to meet the standard.

54 Fed.Reg. at 48,496. Both of these examples sanction the storage of more than what might be considered the "minimum quantity" of waste that is necessary to pursue treatment and disposal options. Still, in each case, the storage is tightly linked to the ongoing or impending utilization of available treatment capacity.

Thus, we conclude that under step one of *Chevron*, section 3004(j) clearly proscribes the indefinite storage of wastes pending the development of treatment and disposal capacity. We wish to emphasize that we are not unsympathetic to the hardships that this decision implies for mixed waste generators. They find themselves in the unenviable position of having no choice but to violate the law. Nevertheless, the possibility that such hardships will occur is inherent in statutes such as RCRA that are expressly designed to force technology by threatening extreme sanctions. Moreover, the fact that technology may not be able to keep up with timetables established by Congress does not mean that courts are at liberty to ignore them, however burdensome the resulting enforcement. Accordingly, if petitioners are to obtain relief from their present predicament, that relief must come from Congress. *See Griffin*, 458 U.S. at 575, 102 S.Ct. at 3252 ("'Laws enacted with good intention, when put to the test, frequently ... turn out to be mischievous, absurd or otherwise objectionable. But in such case the remedy lies with the law making authority, and not with the courts.'") (quoting *Crooks v. Harrelson*, 282 U.S. 55, 60, 51 S.Ct. 49, 51, 75 L.Ed. 156 (1930)).

### III. CONCLUSION

For the foregoing reasons, the petition for review is

*Denied.*