**WYOMING OUTDOOR COUNCIL**
et al., Plaintiffs.

v.

**Michael DOMBECK et al., Defendants.**

No. CIV. A. 00–0725 (RMU).
Document Nos. 9, 10, 16, 25.

United States District Court,
District of Columbia.

March 27, 2001.

Timothy J. Presco, Earthjustice Legal Defense Fund, Bozeman, MT, for Plaintiffs.

Mark L. Stermitz, U.S. Dept. of Justice, Wildlife and Marine Resources Section, Washington, DC, for Defendants.

## *MEMORANDUM OPINION*

URBINA, District Judge.

### GRANTING THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING THE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

### I. INTRODUCTION

This case pits the rights of oil and gas developers against the need to protect the threatened grizzly bear. The plaintiffs, a coalition of environmental groups, bring this action pursuant to the "citizen suit" provision of the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq.* They allege that the United States Forest Service and the Bureau of Land Management ("BLM") (collectively "the defendants") failed to follow proper agency procedures, as mandated by section 7 of the ESA, 16 U.S.C. § 1536, in issuing three oil and gas leases for drilling in the Shoshone National Forest, located southeast of Yellowstone National Park in Wyoming. This case now comes before the court on the parties' cross motions for summary judgment.

On April 4, 2000, the plaintiffs filed a complaint for declaratory and injunctive relief. The plaintiffs allege that the defendants violated the ESA by failing to: (1)

consult with the U.S. Fish and Wildlife Service ("FWS") on the impact of three oil and gas leases on the threatened grizzly bear; (2) reconsult on the impact of oil and gas leasing on the Shoshone National Forest in light of significant new information regarding grizzly bears; and (3) use the best scientific and commercial data available in examining the impact of oil and gas leasing on grizzly bears. *See generally* Complaint ("Compl.").

On August 15, 2000, both parties moved for summary judgment. The parties have fully briefed both motions. On September 18, 2000, the defendants filed a motion to stay proceedings, which the court denied. A crucial point in the procedural history occurred on October 6, 2000, when the defendants announced in their reply brief in support of summary judgment that the BLM had withdrawn the challenged leases altogether.

Accordingly, the defendants maintain that the court should dismiss the case for lack of ripeness. In sum, they argue that even before the BLM withdrew the leases, the case was not ripe because there was no final agency action, and the lack of ripeness became even clearer once the BLM withdrew the leases. The plaintiffs counter that the case was ripe before the withdrawal, meaning that the key inquiry should now be one for mootness. Under the mootness doctrine, if the defendant voluntarily ceases a challenged action, the case is not necessarily moot. Thus, the plaintiffs argue, the court still has subject-matter jurisdiction and can provide the plaintiffs with their requested relief.

For the reasons that follow, the court agrees with the defendants that the case was never ripe. Accordingly, the court will grant the defendants' motion for summary judgment and will deny the plaintiffs' motion for summary judgment.

## II. BACKGROUND

The grizzly bear (*Ursus arctos horribilis*) has been protected by the ESA, 16 U.S.C. §§ 1531 *et seq.*, since its listing as a "threatened" species on July 28, 1975. *See* Defs.' Mot. for Summ. J. at 4. In 1975, the FWS found that "[t]he range of the grizzly bear, which at one time was much of the western United States, is now confined to isolated regions in Montana, Idaho and Wyoming." *See id.* (quoting 40 Fed.Reg. 31,734). As the defendants note, the grizzly's range was reduced to less than two percent of its former range, while its population shrank between 1800 and 1975 from an estimated 50,000 bears to fewer than 1,000. *See id.* (citing Grizzly Bear Recovery Plan, 1993 ("1993 plan")). The species received a listing of "threatened" rather than "endangered" in large part because "the reduction in range occurred mostly in the 19th Century during the westward advance of civilization." *See id.* (citing 40 Fed.Reg. 31,734).

The FWS completed its first recovery plan for the grizzly bear in 1982 and revised the plan in 1993. *See* Defs.' Mot. for Summ. J. at 5. The 1993 plan continues to chart the grizzly bear population in the lower 48 states by distinct geographic sub-populations or recovery zones, including the Yellowstone ecosystem, which encompasses the Shoshone National Forest. *See id.* The 1993 plan estimated that the Yellowstone ecosystem had about 236 bears in 1993. *See id.* (citing 1993 plan at 11).

In September 1992, the Forest Service issued a "Biological Assessment for Actions Proposed in the Proposed Alternative Environmental Impact Statement for Oil and Gas Leasing on the Shoshone National Forest." *See id.* at 6, Administrative Review ("A.R.") Doc. 33. "The Biological Assessment evaluates the potential effects on grizzly bears of the preferred alternative for the oil and gas leasing program

described in the Final Environmental Impact Statement ("FEIS")." *Id.* The Forest Service issued the FEIS in December 1992 pursuant to the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4321 *et seq.*

Despite the development of conservation measures, the Biological Assessment concluded that:

> due to the uncertain nature of possible development following the issuance of oil and gas leases, and the sensitivity of the grizzly bear to disturbance and loss of habitat... this project may affect the grizzly bear. Formal consultation should begin immediately to determine whether this project is likely to jeopardize the continued existence of the grizzly bear on the Shoshone.

*See id.* (citing A.R. Doc. 33 at 24). With this background, the court turns to the case at bar.

The lead plaintiff in this case is the Wyoming Outdoor Council. Founded by Wyoming residents in 1967, the Wyoming Outdoor Council is a conservation organization established to coordinate groups and take action for natural-resource conservation and environmental protection throughout Wyoming. *See* Compl. at 2. The other plaintiffs are the Jackson Hole Conservation Alliance, the Sierra Club, the Northwest Wyoming Resource Council, the American Wildlands, the Dubois Wildlife Association, the Greater Yellowstone Coalition, and the Native Forest Network. The plaintiffs frame their standing argument as follows:

> Members of each of the plaintiff conservation groups use the Shoshone National Forest, including the areas made available for oil and gas leasing, for various recreational and business pursuits, including hiking, hunting, fishing, leading pack trips, and aesthetic enjoyment. Oil and gas leasing and development results in the construction of roads, increased vehicle traffic, the emission of both air and water pollutants, fragmentation of wildlife habitat, disturbance of pristine environments and conflicts with recreational users. The defendants' violations of ESA alleged herein cause direct injury to the recreational, aesthetic and business interests of members of the plaintiff organizations. These injuries are fairly traceable to defendants' conduct, and are addressable through this action.

Compl. at 4.

The U.S. Forest Service is an agency within the United States Department of Agriculture, which has responsibility for managing the national forests, including the Shoshone National Forest. The Forest Service has the legal responsibility to comply with the ESA in conducting oil and gas leasing activities in the Shoshone National Forest. *See id.* The BLM is an agency within the United States Department of the Interior, which has legal authority to issue leases for oil and gas activities on national forest lands. Pursuant to this legal authority, the BLM has offered for sale the three oil and gas leases on the Shoshone National Forest that are at issue in this case. *See id.* The plaintiffs maintain that this court has jurisdiction under the ESA, 16 U.S.C. §§ 1531–44, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–706. *See* Compl. at 5.

### A. Statutory and Regulatory Framework

Under the Federal Onshore Oil and Gas Leasing Reform Act of 1987 ("FOOGLRA"), the BLM and the Forest Service have joint responsibility for the leasing of national forest lands for oil and gas exploration and development. *See* 30 U.S.C. § 226(g)-(h). The FOOGLRA gives the Forest Service the ultimate responsibility

to determine which areas of the national forests are suitable for oil and gas leasing. *See* 30 U.S.C. § 226(h).

The Forest Service regulations governing issuance of oil and gas leases on national forest lands lay out a two-step process for authorizing the issuance of leases. *See* Compl. at 5. First, the Forest Service must determine which lands will be made "administratively available" for leasing by the BLM. *See* 36 C.F.R. § 228.102(c-d). The second step is "lease authorization," in which the Forest Service identifies a specific parcel for leasing, performs specific environmental review on that parcel, and determines whether to authorize the BLM to actually lease that parcel. *See* 36 C.F.R. § 228.102(e). Section 228.102(e) mandates that the Forest Service make three determinations before authorizing the leasing of a specific parcel. After the Regional Forester reviews the area or forest-wide leasing decision, it authorizes the BLM to offer specific lands for leasing subject to:

> (1) Verifying that oil and gas leasing of specific lands has been adequately addressed in a NEPA document, and is consistent with the Forest land and resource management plan...
>
> (2) Ensuring that conditions of surface occupancy... are properly included as stipulations in resulting leases.
>
> (3) Determining that operations and development could be allowed somewhere on each proposed lease, except where stipulations will prohibit all surface occupancy.

36 C.F.R. § 228.102(e). The plaintiffs state that these three findings of fact must be made after a specific parcel is identified for leasing, but before the point at which leasing, and the concomitant transfer of rights, is actually authorized. *See* Compl. at 6.

## B. The Shoshone National Forest Oil and Gas Leases

Located in northwest Wyoming, the Shoshone National Forest is part of the Greater Yellowstone ecosystem, and directly abuts Yellowstone National Park. *See id.* "Its boundaries encompass some of the most visually stunning and ecologically important areas in the lower–48 states... The Shoshone contains resources of national significance, including numerous wilderness areas, habitat for threatened and endangered species such as the grizzly bear, and rivers such as the Clark's Fork of the Yellowstone." *Id.* at 6–7.

In June 1992, the Shoshone National Forest released a draft Environmental Impact Statement ("EIS") laying out a number of alternatives for oil and gas leasing in the forest. In December 1992, the forest issued a final EIS ("FEIS") identifying alternative D as the Forest Service's preferred alternative. *See id.* at 7. More than three years later, in February 1996, a record of decision ("ROD") was issued, adopting alternative D as the oil and gas leasing plan for the Shoshone National Forest. *See id.*

The Shoshone oil and gas leasing plan makes about 1,000,000 acres of the forest administratively available for leasing, with about 500,000 acres available for surface occupancy. *See id.* Neither the EIS nor the ROD identifies specific areas as available for leasing, but rather the Shoshone oil and gas leasing plan identifies broad categories of lands for leasing with various stipulations. *See id.*

The current dispute began on February 2, 2000, when the Forest Service and the BLM offered for sale leases covering two parcels located on the Wind River Ranger District in the area of Brent Creek and one parcel on the Greybull Ranger District in the Gooseberry Creek area near Meteetse. *See id.* The defendants identified

these leases as WY–0002–186, Fremont County, comprising roughly 960 acres; WY–0002–185, Fremont County, comprising roughly 816 acres; and WY–0002–166, Hot Springs County, comprising roughly 1,760 acres. *See id.* "Each of these leases is located in occupied grizzly bear habitat." *See id.* After the period for competitive leasing passed, the defendants sold two of the leases, WY–0002–185 and WY–0002–186, on an over-the-counter basis to the Robert E. Hudson Revocable Trust on or about February 2, 2000. *See id.* at 8. The third lease was never sold.

According to the plaintiffs, oil and gas exploration and development has significant adverse impact on the threatened grizzly bear. *See id.* In June 1993, the FWS issued a formal biological opinion on the impact of oil and gas leasing and development on the Shoshone National Forest, in which the FWS determined that oil and gas activities on the Shoshone National Forest can cause a "taking" of grizzly bears. *See id.*

### C. Procedural History

This case marks the second lawsuit in which the plaintiffs have challenged the oil and gas leasing program on the Shoshone National Forest. In the previous action, which challenged the procedure that the Forest Service announced it would use in allocating oil and gas leases in the Shoshone, United States District Judge James Robertson granted the defendants' motion for summary judgment. *See Wyoming Outdoor Council v. United States Forest Service,* 981 F.Supp. 17 (D.D.C.1997). The D.C. Circuit upheld the district court's decision, holding, among other things, that the Forest Service's procedure was a reasonable interpretation of its relevant regulations. *See Wyoming,* 165 F.3d 43 (D.C.Cir.1999). Specifically, the D.C. Circuit held that "the law does not require an agency to prepare an EIS until it reaches

the critical stage of the decision which will result in 'irreversible and irretrievable commitments of resources' to an action that will affect the environment." *See id.* at 49 (citation omitted). More importantly for purposes of this case, the Court of Appeals ruled that this critical stage occurs at the time of lease issuance, well after the specific lands decision. *See id.* Accordingly, the court held that the plaintiffs' allegations of NEPA violations were not ripe for review. *See id.*

In this case, the plaintiffs allege three causes of action. First, they claim that neither the Forest Service nor the BLM entered into a formal consultation with the FWS concerning the impact on the threatened grizzly bear or other listed species of the site-specific impact associated with the three contested oil and gas leases. *See* Compl. at 8. This allegedly constitutes a violation of section 7 of the ESA, 16 U.S.C. § 1536, since the defendants failed to obtain an opinion from the FWS on the biological impact of the offer and sale of the three contested leases.

Second, the plaintiffs assert that the federal agencies failed to reconsult with the FWS after substantial new information had come to light since the 1993 biological opinion concerning the grizzly bear's use of habitat outside of the grizzly bear recovery zone. *See id.* at 9. Accordingly, they claim that the Forest Service and the BLM again violated section 7 of the ESA.

Finally, the plaintiffs claim that the federal agencies failed to use the best available scientific and commercial data in performing their ESA section 7 consultation duties on the oil and gas leasing and development program on the Shoshone National Forest. *See id.* at 9–10. To redress these alleged violations, the plaintiffs seek declaratory and injunctive relief.

In their motion for summary judgment, the defendants argue that the plaintiffs' case is not ripe for review and that the defendants have complied with the ESA with respect to the grizzly bear.

## III. ANALYSIS

### A. Legal Standard for Summary Judgment

Federal Rule of Civil Procedure 56(c) states that summary judgment is appropriate when the pleadings and evidence demonstrate that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C.Cir.1995). To determine what facts are "material," a court must look to the substantive law on which each claim rests. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. *See Celotex*, 477 U.S. at 322, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *See Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. All evidence and the inferences drawn therefrom must be considered in the light most favorable to the nonmoving party. However, a nonmoving party must establish more than "the mere existence of a scintilla of evidence" in support of its position. *See Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the ultimate burden of proof at trial." *See Celotex*, 477 U.S. at 325, 106 S.Ct. 2548. By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment. *See id.*

In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *See Greene v. Dalton*, 164 F.3d 671, 674 (D.C.Cir.1999). Rather, the nonmoving party "must come forward with specific facts" that would enable a reasonable jury to find in its favor. *See id.* If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (internal citations omitted).

When more than one party moves for summary judgment, each party must carry its own burden of proof. *See United States Dep't. of Justice v. Reporter's Comm. for Freedom of the Press*, 489 U.S. 749, 755, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989). When the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate. *See Crain v. Board of Police Comm'rs*, 920 F.2d 1402, 1405–06 (8th Cir. 1990).

### B. Legal Standard for Ripeness

Before a court may consider the merits of a case, the court must determine whether the case is ripe for review so that it has subject-matter jurisdiction. *See Tari v. Collier County*, 56 F.3d 1533, 1535–36 (11th Cir.1995). The Supreme Court has held that Article III's case-or-controversy requirement prohibits courts from issuing advisory opinions or decisions based on hypothetical facts or abstract

issues. *See Flast v. Cohen,* 392 U.S. 83, 96, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).

█ The ripeness doctrine asks "whether the case has been brought at a point so early that it is not yet clear whether a real dispute to be resolved exists between the parties." *See* 15 Moore's Federal Practice 3d § 101.70[2]. In other words, the ripeness doctrine's "basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *See Abbott Labs. v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). The Supreme Court has instructed district courts to consider whether a dispute is fit for judicial review and whether withholding court consideration would cause hardship to the parties. *See id.*

█ A claim involving an administrative agency action is ripe only when the agency action is final. *See* 5 U.S.C. § 704. If the dispute concerns offenses that have not yet occurred, the plaintiff must show that the probability of the future event occurring is of "sufficient immediacy and reality" to provide a concrete set of circumstances on which the court can rule. *See Steffel v. Thompson,* 415 U.S. 452, 460, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974).

█ The ripeness and mootness doctrines are both grounded on the Article III requirement that courts decide only cases or controversies. *See Regional Rail Reorganization Act, Cases,* 419 U.S. 102, 138, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974). "The ripeness inquiry asks whether there's a pressing need for the court to act, whereas the mootness inquiry asks whether there's anything left for the court to do." *See Western Oil and Gas Ass'n v. Sonoma County,* 905 F.2d 1287, 1290 (9th Cir.1990).

## C. Before the Defendants Withdrew the Leases, the Plaintiffs' Case Was Not Ripe for Review

██ The parties disagree about a key aspect of this case, namely, whether the plaintiffs' suit was ripe for review before the defendants withdrew their leases. While the defendants argue that the case was never ripe, the plaintiffs contend that the case was ripe before the defendants withdrew the leases, and that now the key issue is one of mootness. *See* Defs.' Reply at 2; Pls.' Surreply at 2. The inquiry is not merely hypothetical. Rather, the answer helps resolve this dispute. In essence, if the court were to find that the plaintiffs' case had been ripe for review before the defendants withdrew the leases, then the defendants' voluntary cessation of the challenged action—i.e., the withdrawal of the leases—would not necessarily moot the entire case. *See Friends of the Earth v. Laidlaw,* 528 U.S. 167, 189, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (quoting *City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 289, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982) ("a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.")). Accordingly, in this case, the court would then have had to examine whether any of the plaintiffs' claims would have remained live after the defendant agencies withdrew the leases.[1]

---

1. In voluntary cessation cases, the mootness inquiry centers on two key questions: (1) whether the defendant is free to return to its old ways, and (2) whether it is likely that the defendant will do so. *See* 15 Moore's Federal Practice 3d § 101.99[2]. The court must assess the enforceability of a defendant's promise not to resume the allegedly impermissible

Because the court concludes that the case was never ripe in the first place, however, the court need not conduct a mootness analysis.

 In their opposition to the defendants' motion for summary judgment, the plaintiffs contend that the court should deem the federal agencies' actions final. Arguing that the disputed issues in this case are "fit for judicial review," the plaintiffs assert that they are now raising "purely legal" questions. *See* Opp'n to Defs.' Mot. for Summ. J. at 28. These include asking the court to review the defendant agencies' failure to obtain a biological opinion on their site-specific leasing decisions and the Forest Service's failure to obtain a revised biological opinion on its forest-wide leasing plan. *See id.* The plaintiffs state that their claims "simply ask the court to determine whether the defendant agencies' interpretation of the ESA *not* to require them to obtain such FWS guidance 'represents a permissible reading of the statute.' " *See id.* (emphasis in original) (quoting *Edison Elec. Institute v. EPA,* 996 F.2d 326, 333 (D.C.Cir. 1993)).

The plaintiffs maintain that the defendants offer no legitimate reason to defer judicial review. *See id.* at 32. Asserting that they are facing actual hardship, the plaintiffs insist that the case is ripe because:

> the BLM and the Forest Service have made the decisions necessary to define the terms of the challenged leases and to authorize lease issuance without observing the procedures mandated by the ESA. The fact that the leases have not yet issued does not alter the resulting controversy, make it any less immediate, or in any other way lessen the need for

an expeditious judicial resolution of this case.

*See id.* at 34. The plaintiffs also contend that although two of the three leases had been sold but not yet issued before the leases' withdrawal, the issuance of the leases forecloses the Forest Service's and the BLM's authority to implement protective measures to minimize the harm that oil and gas development would inflict on protected species such as the grizzly bear. *See id.* at 17.

For their part, the defendants note that because the ESA makes no specific provision for judicial review of final agency actions, the APA governs the scope of review. *See* Defs.' Mot. for Summ. J. at 18. Under the APA, a court can review an agency action only when a statute allows review and the agency action is final. *See* 5 U.S.C. § 704.

 The Forest Service and the BLM point out that the agencies have implemented an eight-step process to implement the provisions of the FOOGLRA. *See* Defs.' Mot. for Summ. J. at 10–14. The eight steps are as follows: (1) leasing analysis; (2) leasing decision; (3) verification; (4) BLM assessment; (5) sale by BLM; (6) issuance of lease; (7) application for permit to drill; and (8) application for permit to drill to develop a field. Before the agencies withdrew the contested leases, the leases had reached step five, which is the sale by the BLM. According to the defendants, this does not constitute a sufficiently final agency action:

> At this point, the mere sale of two of the leases, without issuance and without any real knowledge as to how they may or may not be carried out on the ground,

conduct. *See id.* In addition, the voluntary cessation doctrine does not apply when the challenged activity stops for reasons unrelat-

ed to litigation. *See Sze v. INS,* 153 F.3d 1005, 1008–09 (9th Cir.1998).

has not caused Plaintiffs actual harm. No ground disturbing activities can take place until step seven of the leasing process, detailed above as the "application for permit to drill" step, is complete.... Once an application is submitted, the federal agencies will again enter formal consultation, and they will benefit from having additional facts to consider, including a complete physical description of the location and scope of the proposed exploratory well, and all ancillary facilities and activities. If the agencies then fail in the ESA obligations, judicial intervention would be justified.

*Id.* at 20.

The court concludes that this Circuit's precedent supports the defendants' position. Indeed, the relevant case law comes from the first *Wyoming Outdoor Council v. United States Forest Service* case, 165 F.3d 43, 49 (1999). In concluding that the plaintiffs' allegations of a NEPA violation were premature, the D.C. Circuit stated: "we hold that the point of irreversible and irretrievable commitment of resources and the concomitant obligation to fully comply with NEPA do not mature until leases are issued." *See id.* Because the Wyoming Outdoor Council and the other plaintiff environmental groups brought their NEPA action before the BLM had actually issued any leases, the Court of Appeals held that the NEPA claim was unripe. *See id.* at 50. The D.C. Circuit concluded that the key point in time occurred only after the BLM actually issued the leases, i.e., only after the agencies had completed step six in the eight-step process. *See id.* Up until that point, "The Forest Service was free to engage in further efforts to fulfill its NEPA obligations before the leases were issued." *See id.*

The plaintiffs would now have this court believe that the D.C. Circuit's holding in the first *Wyoming Outdoor Council* action

is inapplicable to the case at bar. *See* Opp'n to Defs.' Mot. for Summ. J. at 30–31. In that case, the plaintiffs contend, the Forest Service "explicitly contemplated future efforts to comply with NEPA before lease issuance," whereas the defendant agencies in this case envision no further efforts to comply with the ESA before lease issuance. *See id.* at 31.

But the plaintiffs are attempting to unfairly cabin the D.C. Circuit's holding. Indeed, the facts and claims in this case are almost identical to those of the first case. Once again, the BLM has yet to actually issue the leases. Once again, the plaintiff environmental groups are challenging the defendant agencies' alleged failure to comply with an environmental statute and its regulations, this time the ESA as opposed to the NEPA. And once again, a district court holds that the plaintiffs' claims are not yet ripe.

The court deems persuasive the defendants' arguments that "[t]he leases are simply subject to too many contingencies, uncertainties, conditions and restrictions to be accurately described as either the consummation of the process or as determining rights and obligations." *See* Defs.' Mot. for Summ. J. at 21. Indeed, there is no better evidence that the process in this case was *not* "irreversible and irretrievable" than the very fact that the defendants have withdrawn the leases and taken them off the table entirely. In the final analysis, because the regulatory process only reached step five, the sale of the leases—as opposed to the end of step six, the issuance of the leases—the court applies the D.C. Circuit's ruling to the instant case, and holds that the plaintiffs' suit is premature.

Because the court holds that this case was not ripe for review even before the defendant agencies withdrew the challenged leases, the court lacks subject-

matter jurisdiction to hear the case. Accordingly, the court need not and cannot consider whether the federal defendants complied fully with the ESA.

## IV. CONCLUSION

For all these reasons, the court grants the defendants' motion for summary judgment and denies the plaintiffs' motion for summary judgment. An order directing the parties in a manner consistent with this Memorandum Opinion is separately and contemporaneously executed and issued this 27th day of March, 2001.

## ORDER

GRANTING THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING THE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

For the reasons stated in this court's Memorandum Opinion separately and contemporaneously executed and issued this 27 day of March, 2001, it is hereby

**ORDERED** that the defendants' motion for summary judgment is **GRANTED;** and it is

**FURTHER ORDERED** that the plaintiff's motion for summary judgment is **DE-NIED;** and it is

**ORDERED** that all other motions are **DENIED** as moot.

**SO ORDERED.**