**ALABAMA POWER COMPANY,**
**Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

Nos. 91–1466, 91–1534.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 6, 1992.
Decided Dec. 4, 1992.

Marshall Timberlake, Birmingham, Ala., argued the cause for petitioner. With him on the brief were Glenn G. Waddell, Birmingham, Ala., and William J. Madden, Jr., McNeill Watkins, II, Washington, D.C., also entered an appearance for petitioner.

Joel M. Cockrell, Atty., Washington, D.C., argued the cause for respondent. With him on the brief were William S. Scherman, General Counsel, and Jerome M. Feit, Sol., F.E.R.C., Washington, D.C.

Before: WILLIAMS, SENTELLE, and RANDOLPH, Circuit Judges.

Opinion for the court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

This case is here on petitions for review of orders of the Federal Energy Regulatory Commission directing Alabama Power Company to increase the minimum amounts of water regularly released from its Jordan Dam on the Coosa River and refusing to stay those orders. The principal question is whether the Commission, in these rulings, complied with sections 7(a)(2) and 7(a)(4) of the Endangered Species Act, 16 U.S.C. §§ 1536(a)(2) & 1536(a)(4).

From its source near Rome, Georgia, the Coosa River flows southwestwardly 286 miles through Alabama to its confluence with the Alabama River. Dams of the Alabama Power Company along the river have created an uninterrupted series of impoundments, with the exception of a 7.5 mile reach of the river directly below the Jordan Dam, where a riverine environment still exists. The dam, located several miles north of Montgomery and built in 1928 pursuant to a 50–year license to provide hydroelectric power, impounds the Jordan Reservoir. During relicensing proceedings in 1980, the Commission ordered Alabama Power to conduct a "study to determine what minimum flow release is necessary to insure protection of downstream fisheries and recreation within the operational constraints of the generating units." (*Alabama Power Co.*, 13 F.E.R.C. ¶ 62,082, at 63,115 (1980)).

Alabama Power's study, completed in 1984, disclosed a considerable variance in the flow of the Coosa River at the Jordan Dam, ranging from a low of several dozen cubic feet per second (cfs) in October to a high of several hundred thousand cfs in April in any given year. The company recommended that the minimum flow of the river be set at 188 cfs, a figure corresponding to the estimated seepage from the dam. The United States Fish and Wildlife Service and the Alabama Department of Conservation and Natural Resources opposed this plan, stating that the "leakage flow release would further degrade an already depressed fishery," "reduce an already limited recreational resource," and "potentially degrade water quality." *Ala-*

*bama Power Co.,* 53 F.E.R.C. ¶ 61,217, at 61,877 (1990). In the interests of fishing and recreational boating, both agencies recommended a minimum continuous discharge rate of 4,475 cfs between June and February, and a doubling of that rate during March, April, and May. *Id.*

During the rest of the 1980's, the proceeding moved along at the customary pace until the snails were detected. In 1988, Dr. Robert Hershler reported the existence of *Tulotoma magnifica* in the Jordan Dam tailwater, a discovery of some note because mollusk experts—malacologists—considered the species extinct. The only previously known populations, located in other sections of the Coosa River, met their doom in the 1960's when additional hydroelectric dams were constructed and the snail's habitat was flooded. 56 Fed.Reg. 737, 737 (1991). This is not to suggest that in the stretch of river below the Jordan Dam, the snail itself, although not its significance, could have gone undetected, especially by Coosa River fishermen. Tulotoma grows to the size of a golf ball. Long ago, when the Coosa River was in its natural state, Indians ate these gill-breathing snails and used their shells as ornaments. Because tulotoma prefers "cool, oxygenated, clean, free-flowing waters," *id.,* the snail is generally found in riffles and shoals, spending the daylight hours clinging to the undersides of large rocks. *Id.*

With the discovery of the tulotoma snail, and the consequent prospect that the Interior Department would eventually list the creature as endangered, Alabama Power argued for the first time in 1990 that the Commission's judgment about minimum continuous flows ought to give more attention to protecting the snails. There is no need to recount at this stage the details of the proceedings leading to the Commission's final order on rehearing on July 31, 1991. It is enough to point out that the Commission rejected Alabama Power's request for a stay of an interim order requiring a minimum continuous release of 2,000 cfs from June through February, and 4,475 cfs from March through May; for a stay of the Commission's decision affirming this order; and for a stay pending the compa-

ny's petition for rehearing. On December 20, 1990, while the petition for rehearing was pending, Alabama Power implemented the new flow regime ordered on November 20, 1990.

One event of note occurred thereafter, on June 1, 1991, when Alabama Power abruptly reduced the continuous flow of water from 4,475 cfs to 2,000 cfs. This had the utterly predictable result of leaving a good many tulotoma high and dry. Many of the stranded snails perished. Alabama Power puts the number at "high hundreds to low thousands" and places the blame on the Commission's order, with which it was "simply complying." Brief of Petitioner at 9, 13. The Commission, in its July 31, 1991, decision on rehearing, responded to the catastrophe by modifying the original order to require the company to ramp down the flows from May 29 to May 31 each year. *Alabama Power Co.,* 56 F.E.R.C. ¶ 61,173, at 61,616 (1991).

After Dr. Hershler's discovery in 1988, the Interior Department's Fish and Wildlife Service started the process for listing *Tulotoma magnifica* as an endangered species under the Endangered Species Act, 16 U.S.C. § 1533. The Service published its proposed listing of tulotoma on July 11, 1990. 55 Fed.Reg. 28,573 (1990). The proposal generated two comments, both from Alabama agencies supporting the listing. 56 Fed.Reg. at 798. The final rule, published on January 9, 1991, became effective February 8, 1991. 56 Fed.Reg. at 737. Since that time, federal law has protected tulotoma from capture, harm or relocation. 16 U.S.C. §§ 1532(19), 1538(a) & 1539.

The legal effect of the Service's proposing tulotoma for listing was to trigger the requirement, in section 7(a)(4) of the Endangered Species Act, 16 U.S.C. § 1536(a)(4), that the Commission "confer" with the Secretary of the Interior about any agency action "likely to jeopardize the continued existence" of the species. After tulotoma made the list, section 7(a)(2) of the Act, 16 U.S.C. § 1536(a)(2), required the Commission, "in consultation with and with the assistance of the Secretary," to "insure" that any agency action would not be

likely to have this effect; and to "use the best scientific and commercial data available" in fulfilling the Act's directive. As Alabama Power sees it, the Commission's continuous flow orders and denials of stays after July 11, 1990, when the Service proposed tulotoma for listing, violated section 7(a)(4), and its order on rehearing issued after tulotoma's listing violated section 7(a)(2).

■ As to section 7(a)(4), there is no doubt that the Commission satisfied its duty to "confer" with the Secretary's designee, the Fish and Wildlife Service. The Service was deeply involved in these proceedings from their onset in 1980, when it recommended continuous flows in order to improve the fishery in the Jordan Dam tailwater. By the time the Commission issued its order in late 1990 directing Alabama Power to implement the continuous flow regime, it had already heard from the Service about the effect on the snail. On May 1, 1990, the Service informed the Commission in writing that continuous minimum flows at the Jordan Dam, far from having an adverse impact on the tulotoma snail, "would improve the quality and quantity of the aquatic habitat for this species." Letter from Larry E. Goldman, Field Supervisor, Fish and Wildlife Service, to Lois D. Cashell, FERC 2 (May 1, 1990). Thereafter, in a meeting with Commission staff on December 13, 1990, and through a letter dated December 24, 1990, the Service provided further technical advice. Letter from Larry E. Goldman, Fish and Wildlife Service, to Lois D. Cashell, FERC [hereinafter Fish and Wildlife Study]. Section 7(a)(4) demanded nothing more. The duty to confer arises only when the agency action is "likely to jeopardize the continued existence" of the species. As both the Service and the Commission evaluated the situation, the continuous flow order would have no such consequence.

When Alabama Power complains that the Service was more intent on improving the fishery than in protecting the snail it makes the mistake of supposing that these objectives are somehow inconsistent. Numerous species of fish thrive in the same aquatic environment needed by tulotoma snails. Well-oxygenated, clean, continuous flowing water with riffles and pools and a substrate consisting of rocks and gravel could describe many of the finest trout streams in the nation. While the Coosa River below Jordan Dam is not a coldwater stream and is not favored with trout, the fish it holds—spotted bass, blue catfish, channel catfish, crappie, hybrid striped bass, white bass, and freshwater drum—benefit from the same conditions. Like trout, some of these species feed on the caddisflies, mayflies, and stoneflies found predominantly in riffles. 53 F.E.R.C. at 61,872. Alabama Power's own study also disclosed that more larval fish were found in these sections of the Jordan Dam tailwater, thus indicating that the fish were using the riffle/runs as a nursery and spawning ground. *Id.* The continuous flow regime therefore held the promise of simultaneously improving the fishery and the habitat of the tulotoma snail.

As far as section 7(a)(4) is concerned, the Commission fulfilled its duty, "in consultation" with the Service, of insuring that continuous flows would not be "likely to jeopardize the continued existence" of the snail. After the Service listed tulotoma, the Commission, at Alabama Power's urging, requested "formal consultation" with the Service on the effect of the new minimum flows on the snail. *See* 50 C.F.R. § 402.14. In making this request, the Commission may have done even more than the Act required of it. The regulations of the Fish and Wildlife Service provide that formal consultation is unnecessary when, "as a result of informal consultation with the Service," the agency determines, "with the written concurrence of the Director, that the proposed action is not likely to adversely affect any listed species or critical habitat." 50 C.F.R. § 402.14(b)(1). At any rate, the Service acceded to the Commission's request on March 4, 1991, and began developing its "Biological Opinion" regarding the likely effect of the agency action. *See* 50 C.F.R. § 402.14(g)(4); 16 U.S.C. § 1536(c). For its part, the Commission deferred final action on Alabama Power's rehearing petition. The Service issued

its Biological Opinion on July 10, 1991, after receiving comments from the Commission and Alabama Power. The Opinion concluded that the "mainstream Coosa River population of tulotoma may benefit from the Commission's Orders"; and that "the minimum continuous flows ordered by the Commission increase the amount of habitat available to the snail and significantly alleviate the impacts of low flows and extreme flow fluctuations which occurred almost daily prior to December 20, 1990." Fish and Wildlife Study at 8–9. The Commission then denied Alabama Power's rehearing petition, but—as mentioned earlier—modified its previous order by requiring a gradual decrease of the flow during the transition from the May rate to the lower rate of release in effect from June to February.

 The Commission's violation of section 7(a)(2), according to Alabama Power, stemmed from its failure to conduct a "study of the snail's habitat needs and life cycle in those conditions which existed prior to the implementation of the minimum flow order." Brief of Petitioner at 7 & n. 3. One might wonder how this argument can be squared with the findings by the Service and the Commission that the preexisting flow regime had been harmful to the snail. No one could seriously urge jeopardizing the snail in order to study how to avoid jeopardizing it. Alabama Power saw things differently. The company enlisted the services of a malacologist, Dr. Fred G. Thompson, submitting his affidavit to the Commission on December 13, 1990. In Dr. Thompson's opinion, there was insufficient evidence about the snail to enable anyone to conclude that increased flows would not have adverse effects. He advocated maintaining the status quo for 1½ to 2 years to permit a "baseline study" of the snail. Relying on this affidavit, Alabama Power submits that the Commission did not "use the best available scientific and commercial data available," as section 7(a)(2) requires.

We reject this argument for the following reasons. In the first place, the affidavit could have related only to section 7(a)(4), not section 7(a)(2): when the company filed the affidavit, the Service had only proposed tulotoma for listing. The Commission's obligation at that stage was not to consult, but to "confer," and to confer only if its action would be "likely to jeopardize" the snail's existence. 16 U.S.C. § 1536(a)(4). Significantly, Dr. Thompson's affidavit expressed no opinion that the snails would likely be jeopardized. Rather, he "question[ed]" the Service's conclusion that the snails would benefit from the increased flows. Furthermore, section 7(a)(4) does not have a "best-scientific-evidence-available" requirement such as the one contained in section 7(a)(2). Yet not until February 8, 1991, when the snail was listed, did section 7(a)(2) become applicable. By that time, Dr. Thompson's proposal had become moot. Alabama Power had already begun complying with the Commission's continuous flow order, which went into effect on December 20, 1990. "All baseline data, requisite to a full and complete study," Dr. Thompson stated, "will be virtually eliminated" once the flows are released, making it "virtually impossible to conduct a significant and meaningful 'comparative' study...." In other words, a worthwhile baseline study could not have been performed from that point forward according to the company's own expert. *Roosevelt Campobello International Park v. EPA*, 684 F.2d 1041 (1st Cir.1982), which Alabama Power invokes for the proposition that section 7(a)(2) required the Commission to conduct a baseline study, is beside the point. Section 7(a)(2) does not demand the impossible.

Alabama Power's remaining arguments do not warrant discussion. These have been considered and rejected.

The petition for review is denied.