**WYOMING OUTDOOR COUNCIL et al., Plaintiffs,**

**v.**

**Dale BOSWORTH, Chief, U.S. Forest Service, et al., Defendants.**

**Civil Action No. 01–2340 (RMU).**

United States District Court, District of Columbia.

Sept. 30, 2003.

Timothy Joseph Preso, EarthJustice Legal Defense Fund, Bozeman, MT, for plaintiffs.

Mark L. Stermitz, U.S. Department of Justice, Environment & Natural Resources Division, Ben Franklin Station, Robert Lee Gulley, U.S. Department of Justice, Environmental Division, Washington, DC, for defendants.

## *MEMORANDUM OPINION*

URBINA, District Judge.

GRANTING THE PLAINTIFFS' MOTION FOR LEAVE TO FILE SUR-REPLY; DENYING THE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT; GRANTING THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### I. INTRODUCTION

In this action, a coalition of environmental groups ("the plaintiffs") bring suit pursuant to the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.* They allege that the United States Forest Service ("Forest Service") and the Bureau of Land Management ("BLM") (collectively, "the defendants") failed to follow ESA consultation requirements, thereby violating the APA. Specifically, the plaintiffs allege that the defendants failed to formally consult with the Fish and Wildlife Service ("FWS") before issuing several oil and gas leases in Wyoming, and that the Forest Service failed to reinitiate formal consultation with the FWS after receiving new information about grizzly bears. The defendants argue that the plaintiffs' claims are not ripe and that in any event the defendants are under no duty to consult. Because the plaintiffs' failure-to-initiate claims are not ripe, and because the Forest Service's failure to reinitiate consultation was not arbitrary or capricious under the APA, the court denies the plaintiffs' motion for summary judgment and grants the defendants' motion for summary judgment.

### II. BACKGROUND

The challenged actions involve the somewhat complicated interaction between three sets of federal statutes and regulations: those authorizing oil and gas leasing on public lands, those authorizing oil and gas leasing on national forests, and those providing for the protection of endangered species. The court therefore takes a moment to outline the relevant statutory and regulatory frameworks.

#### A. Statutory and Regulatory Frameworks

#### 1. Oil and Gas Leasing on Public Lands and National Forests

The Mineral Leasing Act of 1920 ("the MLA"), 30 U.S.C. §§ 181 *et seq.*, provides

authority for oil and gas leasing on both public and national forest system lands. 30 U.S.C. §§ 181 *et seq.* The MLA assigns primary responsibility for regulating leasing on public lands to the Secretary of the Interior, acting through the BLM. *Id.* § 226(a), (g); 43 C.F.R. subpart 3100. As amended by the Federal Onshore Oil and Gas Leasing Reform Act ("FOOGLRA") in 1987, the MLA grants authority to regulate leasing on forest lands to the Secretary of Agriculture, acting through the Forest Service. 30 U.S.C. § 226(g)-(h); 36 C.F.R. part 228.

Under the FOOGLRA, the Forest Service and the BLM share responsibility for the issuance of leases on forest lands. 30 U.S.C. § 226(h). The leasing process consists of eight steps: (1) leasing analysis; (2) leasing decision; (3) verification; (4) BLM assessment; (5) sale by the BLM; (6) issuance of lease; (7) application for permit to drill; and (8) application for permit to drill to develop a field.[1] Defs.' Mot. for Summ. J. ("Defs.' Mot.") at 8–12. First, the Forest Service conducts a National Environmental Policy Act ("NEPA") analysis to identify the lands that will be made administratively available for leasing by the BLM. 36 C.F.R. § 228.102(a)-(d); *id.* at 8–9; Pls.' Mot. for Summ. J. ("Pls.' Mot.") at 13. Second, the Forest Service identifies a specific parcel for leasing, performs specific environmental review on that parcel, and determines whether to authorize the BLM to lease that parcel. 36 C.F.R. § 228.102(e); Defs.' Mot. at 9. Third, the Forest Service verifies that the leasing was adequately addressed in a NEPA document and is consistent with management plans, ensures that conditions of surface occupancy have been included as stipulations[2] in the lease and determines that operations and development could be allowed somewhere on the lease (unless stipulations prohibit all surface occupancy). 36 C.F.R. § 228.102(e); Defs.' Mot. at 9; Pls.' Mot. at 14. Fourth, the BLM determines whether it should attach additional stipulations to the parcel. 43 C.F.R. § 3101.7–2(a)–(b); Defs.' Mot. at 10.

At the fifth step in the process, the lease parcel is ready for sale. The BLM conducts sales of the lease parcel and includes all stipulations in the sale notice. 43 C.F.R. § 3120.4–1; Defs.' Mot. at 10. Sixth, the BLM decides to issue the lease, incorporating all Forest Service stipulations. 43 C.F.R. § 3101.7–2(a); Defs.' Mot. at 10. Seventh, before the lessee may conduct drilling operations or other surface-disturbing activities, the lessee must submit an Application for a Permit to Drill ("APD") that includes a Surface Use Plan of Operation ("SUPO") describing the proposed well in detail. 30 U.S.C. 226(g); 43 C.F.R. § 3162.3–1(c); 36 C.F.R. § 228.106; Defs.' Mot. at 10–11. The Forest Service evaluates the SUPO for its environmental consequences and stipulation consistency and either approves it as submitted, approves it subject to conditions, or disapproves it. 36 C.F.R. §§ 228.107(a)-(b), 228.108; Defs.' Mot. at 11. Eighth and finally, the lessee must submit additional applications before conducting field-development activities. 36 C.F.R. §§ 228.106(d), 251.82(a); 43 C.F.R. §§ 3162.3–1, 3–2; Defs.' Mot. at 11.

### 2. Endangered Species Act

The ESA is comprehensive legislation for the preservation of endangered species.

---

1. The defendants point out that "[t]he process that BLM uses for oil and gas leasing on BLM managed lands is substantively similar to that employed when the leasing occurs on National Forest System lands although the terminology may differ slightly." Defs.' Mot. at 8.

2. Lease stipulations are "mitigation measures identified during the leasing analysis based on the effects of a typical [oil or gas] well on known affected resources." Pls.' Mot. Ex. 9.

*Tenn. Valley Auth. v. Hill,* 437 U.S. 153, 180, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). Under the ESA, the Secretary of the Interior, acting through the FWS, lists those fish, wildlife or plant species he has determined to be endangered or threatened. 16 U.S.C. § 1533(a); *Rancho Viejo, LLC v. Norton,* 323 F.3d 1062, 1064 (D.C.Cir. 2003).

Section 7 of the ESA directs each federal agency to ensure that its actions are "not likely to jeopardize the continued existence of any endangered species." 16 U.S.C. § 1536(a)(2). To carry out this duty, an agency considering whether to implement a proposed action works closely with the FWS. At the outset, the agency must ask the FWS whether a listed species is present in the area of the proposed action. 16 U.S.C. § 1536(c); *Idaho v. Interstate Commerce Comm'n,* 35 F.3d 585, 596 (D.C.Cir.1994). If the FWS responds affirmatively, the agency must complete a biological assessment to identify the species the action is likely to affect. *Id.* If the agency's assessment indicates that the proposed action "may affect" listed species or critical habitat, the agency must initiate "formal consultation" with the FWS. 16 U.S.C. § 1536(a); 50 C.F.R. § 402.14; *Rancho Viejo,* 323 F.3d at 1064. During the period of formal consultation, the agency may not make any "irreversible or irretrievable commitment of resources." 16 U.S.C. § 1536(d).

At the end of formal consultation, the FWS issues a biological opinion that sets forth a determination indicating whether the proposed action is likely to jeopardize the continued existence of a listed species. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(h)(3); *Rancho Viejo,* 323 F.3d at 1064. If the FWS makes a "jeopardy" determination, the biological opinion must set forth "reasonable and prudent alternatives" aimed at avoiding such consequences. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(3); *Rancho Viejo,* 323 F.3d at 1064. If the FWS finds no jeopardy, it nonetheless must provide the agency with a statement indicating any incidental take of the species resulting from the proposed action and setting forth reasonable and prudent measures to minimize that take. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i). The FWS also may offer conservation recommendations. 50 C.F.R. § 402.14(j).

In certain situations, no formal consultation is necessary. The agency and the FWS may engage in informal consultation to assist the agency in determining whether formal consultation is required. 50 C.F.R. § 402.13. Should the agency determine from this informal consultation that the proposed action is not likely to adversely affect any listed species, and the FWS concurs, the agency need not initiate formal consultation. *Id.* § 402.14(b); *Ala. Power Co. v. Fed. Energy Regulatory Comm'n,* 979 F.2d 1561, 1564 (D.C.Cir. 1992). At that point, "the consultation process is terminated, and no further action is necessary." 50 C.F.R. § 402.13(a).

Finally, ESA regulations provide that the agency or the FWS must reinitiate formal consultation if (1) the incidental take exceeds the level set in the incidental-take statement, (2) new information reveals effects of the agency action that may affect listed species "in a manner or to an extent not previously considered," (3) the agency modifies its action in a manner adversely affecting the listed species that the FWS did not consider in its opinion, or (4) the action may affect a newly listed species. 50 C.F.R. § 402.16.

## B. The Yellowstone Grizzly Bear Population and the Disputed Oil and Gas Leases

The FWS has listed the grizzly bear (*Ursus arctos horribilis*) of the lower 48

states as a threatened species under the ESA since 1975. Defs.' Statement of Undisputed Material Facts ("Defs.' Statement") ¶ 5; Pls.' Statement of Undisputed Material Facts ("Pls.' Statement") ¶ 2. In its initial listing of the grizzly, the FWS noted that "[t]he range of the grizzly bear, which at one time was much of the western United States, is now confined to isolated regions in Montana, Idaho and Wyoming." Defs.' Statement ¶ 5; Compl. ¶ 16. Between 1800 and 1975, the grizzly's range dwindled to less than two percent of its former range, while its population shrank from an estimated 50,000 bears to fewer than 1,000. *Id.* In 1993, the FWS revised and reissued its grizzly bear recovery plan, a technical, scientific document used to plan the conservation and recovery of the species. Defs.' Statement ¶ 6; Defs.' Mot. at 16 & Ex. 13; Pls.' Mot. at 4–5 & Ex. 2. According to the 1993 plan, the Yellowstone ecosystem had an estimated 236 grizzly bears in 1993. *Id.*

The Brent Creek area of the Yellowstone ecosystem provides "[s]ome of the most important and productive grizzly bear habitat" in the ecosystem. Pls.' Mot. at 7. The Brent Creek area's northern portion falls within the Forest Service's Shoshone National Forest, while its southern portion falls within the BLM's Lander Resource Area. *Id.* at 7 & Ex. 2; Pls.' Statement ¶ 3; Defs.' Statement ¶ 6; Defs.' Mot. Ex. 13. Of the six leases at issue in this case, two are located on the Shoshone National Forest and four are located on the Lander Resource Area. *E.g.,* Pls.' Mot. Ex. 1.

With regard to the Forest leases, in June 1992 the Forest Service took the first step in the eight-step leasing process by released a draft Environmental Impact Statement ("EIS") pursuant to the FOOGLRA that set forth a number of alternatives for oil and gas leasing in the forest.

Pls.' Mot. Ex. 12. In December 1992, the Forest Service issued a Final Environmental Impact Statement ("FEIS") that identified its preferred leasing alternative. *Id.* at 14; Defs.' Statement ¶ 8. The preferred alternative made 950,565 acres of the forest administratively available for leasing, with just under half—or 463,625—of those acres made available for surface occupancy. Pls.' Mot. at 14–15 & Ex. 12.

Prior to issuing the FEIS, the Forest Service conducted a biological assessment of the potential effects of its preferred alternative on grizzly bears. Defs.' Statement ¶ 9; Defs.' Mot. Ex. 2. The biological assessment concluded that because of the "uncertain nature of possible development following the issuance of oil and gas leases, and the sensitivity of the grizzly bear to disturbance and loss of habitat[,] the [preferred alternative] may affect the grizzly bear." *Id.* Accordingly, the Forest Service requested formal consultation with the FWS and asked the FWS to issue a biological opinion on the impact of the preferred alternative on the grizzly bear. Defs.' Mot. Ex. 2. In 1993, the FWS issued a biological opinion ("the 1993 Biological Opinion") making a "no jeopardy" determination. *Id.;* Defs.' Statement ¶ 12. Specifically, although the FWS noted that oil and gas exploration and development generally is detrimental to grizzly bears, it determined that the preferred alternative was not likely to result in jeopardy to the bears as long as the Forest Service adopted a number of mandatory measures to minimize the incidental take of bears. Defs.' Statement ¶¶ 10–11; Defs.' Mot. Ex. 2; Pls.' Mot. Ex. 7. The FWS directed the Forest Service to reinitiate formal consultation with the FWS if, *inter alia,* "new information reveals effects of the agency action that may affect listed species or critical habitat in a manner or to an extent not considered in this opinion." Defs.' Statement ¶ 13; Pls.' Mot. Ex. 7. In 1995,

the Forest Service formally adopted the preferred alternative in a Record of Decision. Defs.' Statement ¶ 8; Pls.' Mot. at 14 & Ex. 9.

Neither the FEIS nor the Record of Decision identified specific sites within the forest as available for leasing, instead identifying broad categories of lands for leasing subject to various stipulations. *See generally* Pls.' Mot. Exs. 9, 12. In 1998, the Forest Service made site-specific decisions authorizing the BLM to issue two leases on the Shoshone National Forest.[3] Defs.' Mot. at 12; Pls.' Mot. at 16 & Ex. 14. Both leases contained notices emphasizing ESA requirements for the grizzly bear. Pls.' Mot. Ex. 14. Neither lease contained stipulations prohibiting all surface use of the lease parcels. *Id.* at 16 & Ex. 14.

With regard to the Lander leases, in 1987 the BLM completed a resource-management plan that made all of the lands in the Brent Creek portion of the Lander Resource Area available for leasing. *Id.* at 12 & Ex. 10. In 1997 and 1998, pursuant to the resource-management plan, the BLM issued four leases.[4] *Id.* at 12–13 & Ex. 11. Each lease contained a notice indicating that the lease parcel may contain grizzly bear habitat. *Id.* Ex. 11. No lease contained stipulations prohibiting all

surface use of the lease parcels. *Id.* at 13 & Ex. 11.

## C. Procedural History

The oil and gas leasing program at issue here has been the subject of several court rulings over the past few years. The plaintiffs first brought suit against the Forest Service in 1997, alleging that the Forest Service violated its own leasing regulations and the NEPA when it authorized oil and gas leases on the Shoshone National Forest before verifying that the leasing had been adequately addressed in an EIS. *Wyo. Outdoor Council v. United States Forest Serv.*, 981 F.Supp. 17 (D.D.C.1997) (Robertson, J.) ("*Wyoming I*"). In granting summary judgment for the defendants, the district court concluded that the Forest Service's interpretation of its NEPA-verification regulations warranted deference, and that its FEIS was sufficiently detailed to satisfy NEPA requirements. *Id.* at 19–20. On appeal, the D.C. Circuit agreed that the Forest Service's interpretation of its regulations deserved deference but dismissed the plaintiffs' NEPA claim as unripe.[5] *Wyo. Outdoor Council v. United States Forest Serv.*, 165 F.3d 43, 54 (D.C.Cir. 1999) ("*Wyoming II*").

In 2000, after the defendants sold two lease parcels,[6] the plaintiffs again brought

---

**3.** The leases in question are WYW–145799 and WYW–146470. Pls.' Mot. at 16. In October 1999, the holder of lease WYW–146470 submitted an APD to the BLM. *Id.* at 16 & Ex. 15. The APD "proposed reconstruction of a primitive road and clearing of a two-acre well pad in the Brent Creek area, with drilling and related activities spanning an approximately three-month period." *Id.* at 16. At the time of the parties' submissions, the Forest Service was analyzing the APD. *Id.* at 16 & Ex. 16. In July 2001, the Forest Service stated that if its biological assessment of the SUPO accompanying the APD indicates that a "may adversely effect" finding will occur, it would

request formal consultation with and a biological opinion from the FWS. *Id.* Ex. 17.

**4.** The leases in question are WYW–141369, WYW–142262, WYW–141370, and WYW–143654.

**5.** The court drew a distinction between the plaintiffs' two claims, treating the plaintiffs' regulatory interpretation claim as procedural and the plaintiffs' NEPA claim as substantive. *E.g., Wyoming II*, 165 F.3d at 49.

**6.** The defendants later withdrew the challenged leases. *Wyoming III*, 148 F.Supp.2d at 3.

suit, this time arguing that the defendants had violated the ESA by failing to consult with the FWS on the impact of the leases on grizzlies, reconsult with the FWS on the impact of leasing in light of new information, and use the best scientific and commercial data available to examine the impact of that leasing. *Wyo. Outdoor Council v. Dombeck,* 148 F.Supp.2d 1 (D.D.C.2001) (*"Wyoming III"*). Looking to *Wyoming II,* the court concluded that the sale of the leases did not render the case ripe for review, and granted summary judgment for the defendants. *Id.* at 10–11.

In 2001, after the defendants issued the six Shoshone and Lander leases, the plaintiffs came back to court to file the instant complaint. The plaintiffs maintain that the defendants violated the ESA by failing to consult with the FWS before issuing the leases, and that the Forest Service violated the ESA by failing to reinitiate consultation with the FWS in light of new information regarding grizzly bear use of habitat on the Shoshone National Forest. Compl. ¶¶ 1, 46, 51, 55. The plaintiffs seek declaratory and injunctive relief. *Id.* at 20–21. In 2002, the plaintiffs filed a motion for summary judgment and the defendants responded with a cross-motion for summary judgment. At the end of the parties' extensive briefing, the plaintiffs filed a motion for leave to file a sur-reply.[7] The plaintiffs also submitted two notices of supplemental authority. The court now turns to the parties' motions for summary judgment.

## III. ANALYSIS

### A. Legal Standard for Summary Judgment

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Diamond v. Atwood,* 43 F.3d 1538, 1540 (D.C.Cir.1995). To determine which facts are "material," a court must look to the substantive law on which each claim rests. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson,* 477 U.S. at 255, 106

---

7. In their motion for leave to file a sur-reply, the plaintiffs argue that in their reply, the defendants presented (1) new arguments regarding their ability to deny development to protect listed species in non-jeopardy situations and (2) new evidence that this ability is more than adequate to protect grizzly bears. Pls.' Mot. for Leave at 1. In response, the defendants contend that they simply responded to the plaintiffs' views regarding the impact of lease issuance on the defendants' authority. Defs.' Opp'n to Pls.' Mot. for Leave at 1. "When a party is unable to contest matters presented to the court for the first time in the last scheduled pleading," the court may grant that party leave to file a sur-reply. *Ben–Kotel v. Howard Univ.,* 319 F.3d 532, 536 (D.C.Cir.2003). The decision whether to grant leave falls within the court's discretion. 5 FED. PRAC. & PROC. CIV. 2d § 1189 (noting that "the court has inherent discretion to permit the filing of any document that it thinks will be helpful," including unauthorized pleadings). Although it is debatable whether the defendants raised new issues in their reply, the court grants the plaintiffs' motion. *Id.*

S.Ct. 2505. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252, 106 S.Ct. 2505. To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment. *Id.*

In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C.Cir.1999); *Harding v. Gray*, 9 F.3d 150, 154 (D.C.Cir.1993). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Greene*, 164 F.3d at 675. If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (internal citations omitted).

### B. Legal Standard for Ripeness [8]

Article III of the Constitution limits the jurisdiction of federal courts to cases or controversies. U.S. CONST. ART. III,

§ 2, cl. 1. The case-or-controversy requirement reflects the "common understanding of what it takes to make a justiciable case." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). Among the various doctrines developed by the courts to test the fitness of controversies for judicial resolution is the ripeness doctrine. *Wyoming II*, 165 F.3d at 47–48.

The ripeness doctrine asks "whether the case has been brought at a point so early that it is not yet clear whether a real dispute to be resolved exists between the parties." 15 FED. PRAC. 3d § 101.70[2]. Reflecting both constitutional and prudential considerations, the doctrine "is designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)); *see also Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 57 n. 18, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993) (stating that "[the] ripe-

8. The plaintiffs contend that because their claims allege failure to comply with the ESA, they are procedural in nature and are automatically ripe. Pls.' Reply & Opp'n at 34. In *Ohio Forestry*, the Supreme Court indicated that "a person with standing who is injured by a failure to comply with some procedural requirement may complain of that failure at the time the failure takes place, for the claim can never get any riper." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 737, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998). Citing the NEPA as an example, the Court noted that procedural statutes "simply guarantee[] a particular procedure, not a particular result." *Id.* Lower courts, however, have not interpreted *Ohio Forestry's* procedural-substantive distinction consistently. Trent Baker, *Judicial Enforcement of Forest Plans in the Wake of* Ohio Forestry, 21 PUB. LAND & RESOURCES L.REV. 81, 82, 91 (2000) (reviewing post-*Ohio Forestry* cases and concluding that "decisions by lower courts are inconsistent in their characterization of claims as either procedural or substantive"). In *Wyoming II*, the D.C. Circuit treated the plaintiffs' failure-to-comply NEPA claim as substantive and applied the ripeness doctrine. *Wyoming II*, 165 F.3d at 49. Accordingly, this court follows the court of appeals' lead by treating the plaintiffs' ESA claims as substantive and applying the usual ripeness analysis. *Id.*

ness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction").

Toward that end, a court must examine whether a dispute is fit for judicial review and whether withholding court consideration would cause hardship to the parties. *Ohio Forestry,* 523 U.S. at 733, 118 S.Ct. 1665; *Wyoming II,* 165 F.3d at 48. To measure fitness, the court looks to "whether [the issue] is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final." *Atl. States Legal Found. v. Envtl. Prot. Agency,* 325 F.3d 281, 284 (D.C.Cir.2003). If a claim "rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all," it is not ripe for adjudication. *Id.* As for hardship, the court looks to see whether the party can show that it will suffer injury in the interim. *Id.*

### C. Legal Standard for Judicial Review of Agency Actions Pursuant to the ESA

■ Judicial review of agency actions under the ESA is governed by the APA. *Gerber v. Norton,* 294 F.3d 173, 178 n. 4 (D.C.Cir.2002). The APA entitles "a person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action ... to judicial review thereof." 5 U.S.C. § 702. Under the APA, a reviewing court must set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706; *Tourus Records, Inc. v. Drug Enforcement Admin.,* 259 F.3d 731, 736 (D.C.Cir.2001). In making this inquiry, the reviewing court "must consider whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v.*

*Oregon Natural Res. Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (internal quotations omitted). At a minimum, the agency must have considered relevant data and articulated an explanation establishing a "rational connection between the facts found and the choice made." *Bowen v. Am. Hosp. Ass'n,* 476 U.S. 610, 626, 106 S.Ct. 2101, 90 L.Ed.2d 584 (1986); *Tourus Records,* 259 F.3d at 736. "[T]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Veh. Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Rather, the agency action under review is "entitled to a presumption of regularity." *Citizens to Pres. Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), *abrogated on other grounds, Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977).

### D. The Court Grants Summary Judgment for the Defendants on the Plaintiffs' Claims That the Defendants Failed to Initiate Formal Consultation

#### 1. The Parties' Arguments

The plaintiffs allege that under the ESA, the defendants should have initiated formal consultation with the FWS before issuing the six leases given that (1) the defendants were aware that the Brent Creek area served as grizzly bear habitat and (2) the lease issuance constituted an action that "may affect" grizzlies. Pls.' Mot. at 17, 19–20 (citing 50 C.F.R. § 402.14(a)). On the first point, the plaintiffs present evidence that they believe shows the awareness of both defendants regarding bear habitat in the Brent Creek area. *Id.* at 20–24. With regard to the BLM, the plaintiffs point to a 1992 Wyo-

ming Game & Fish Department ("WGFD") memorandum advising the BLM that the Dubois area was grizzly habitat, and a 1994 WGFD report documenting extensive grizzly use of the Brent Creek area. *Id.* at 20–21 (citing Pls.' Mot. Exs. 4, 18). After receiving the WGFD *memorandum* and report, the BLM allegedly withdrew several proposed leases from sale and imposed a moratorium on further leasing pending ESA compliance. *Id.* at 20–22 & Exs. 20–22. As for the Forest Service, the plaintiffs stress that the 1993 Biological Opinion prepared for the Forest Service indicated that the leasing program would result in the taking of an undetermined number of grizzlies and that new information about the importance of the Brent Creek area was beginning to emerge. *Id.* at 22–24 (citing Pls.' Mot. Ex. 7).

On the second point, the plaintiffs state that lease issuance threatens grizzlies because issuance is the "irreversible and irretrievable" point at which the lessee gains the legal right to undertake surface development, even if such development does not occur until years later. *Id.* at 24–25. Citing various regulations and a memorandum from the Office of the Regional Solicitor at the Department of the Interior, the plaintiffs argue that once the defendants issue a lease, they no longer have the authority to preclude surface-disturbing activities but are limited to implementing minor siting and timing modifications. *Id.* at 24–28 (citing 43 C.F.R. § 3101.1–2; 53 Fed.Reg. 17,341; Pls.' Mot. Exs. 23–24). Accordingly, the plaintiffs conclude that the defendants' lease issuance triggered the ESA's formal consultation requirement, and that the defendants violated the ESA by failing to consult with the FWS. *Id.* at 27–28, 34.

The defendants respond by asserting that the plaintiffs' claims are not ripe for judicial review and therefore must be dismissed. Defs.' Mot. at 22. Emphasizing that a lessee does not have the right to engage in any surface-disturbing activity until the defendants approve the APD and the SUPO, the defendants maintain that they retain the authority after lease issuance to modify or deny the use of the lease parcel to meet ESA requirements. *Id.* at 24–26, 35–36 (citing 30 U.S.C. § 226(g); 36 C.F.R. § 228.107(b)(2); 43 C.F.R. §§ 3101.1–2, 3162.3–1; Pls.' Mot. Exs. 9, 23). In the defendants' view, because lease issuance does not definitively determine the lessee's rights and "it is far from certain that the lease will ever result in drilling or surface disturbing activities," the plaintiffs' claims are not ripe. *Id.* at 26–29 (citing Pls.' Mot. Exs. 9, 12).

In the alternative, the defendants argue that even if the plaintiffs' claims are ripe, no formal consultation was required prior to lease issuance because the Forest Service and the FWS agreed that formal consultation would occur at the APD stage, after lease issuance. *Id.* at 29 (citing Pls.' Mot. Ex. 7; Defs.' Mot. Exs. 2, 6). According to the defendants, the agencies recognized that surface-disturbing activities would not occur until the APD stage, and the 1993 Biological Opinion accordingly directed the Forest Service to initiate formal consultation at that point. *Id.* at 29–31 (citing Pls.' Mot. Ex. 7; Defs.' Mot. Exs. 2, 6).

### 2. The Plaintiffs' Claims Are Not Ripe [9]

██ Because the plaintiffs' claims "rest[ ] upon contingent future events that

---

**9.** The court notes that even if the plaintiffs' failure-to-initiate claims were ripe, they likely would not survive APA review given the "[h]ighly deferential" arbitrary and capri-

cious standard that presumes the validity of agency action. *Transmission Access Policy Study Group v. Fed. Energy Regulatory Comm'n,* 225 F.3d 667, 714 (D.C.Cir.2000);

may not occur as anticipated, or indeed may not occur at all," the court once again concludes that the plaintiffs' claims are not ripe. *Atl. States*, 325 F.3d at 284. The plaintiffs' challenge rests on the theory that at lease issuance—i.e., step six—"the legal right for the leaseholder to undertake . . . industrial development is conveyed," even if the transformation of the lease parcel from bear habitat to an industrial site may not occur for years to come. Pls.' Mot. at 24–25.

But the extent and impact of the lessee's right at lease issuance is murkier than the plaintiffs make it out to be. BLM regulations state that the lessee "shall have the right to use so much of the leased lands as is necessary to explore for, drill for, mine, extract, remove and dispose of all the leased resource in a leasehold." 43 C.F.R. § 3101.1–2. The regulations, however, go on to subject that right to three reservations: "[1][s]tipulations attached to the

lease; [2] restrictions deriving from specific, nondiscretionary statutes [such as the ESA]; and [3] reasonable measures . . . to minimize adverse impacts to other resource values" not addressed in the stipulations. *Id.* The first reservation explicitly acknowledges the species-specific and other stipulations incorporated into the lease by both the Forest Service and the BLM.[10] *Id.;* 36 C.F.R. § 228.102(e)(2); 43 C.F.R. §§ 3101.1–3, 3101.7–2(a). The second reservation ensures that the BLM and the Forest Service may impose restrictions required by the ESA, a "nondiscretionary statute," including those restrictions that could "cause a portion of the leased land to be restricted from operational activities or . . . deny access to the leased area without the requirement of a lease stipulation." Defs.' Mot. Ex. 1. Such restrictions may include "reasonable and prudent alternatives" suggested by the FWS pursuant to a "jeopardy" determination, "reasonable

---

*see also Motor Veh. Mfrs. Ass'n*, 463 U.S. at 43, 103 S.Ct. 2856 (noting the narrow scope of judicial review under the APA); *Overton Park*, 401 U.S. at 415, 91 S.Ct. 814 (stating that the agency action under review is "entitled to a presumption of regularity").

10. In this case, the four Lander leases each contain a notice referring to the ESA and indicating that the lease parcel "may contain habitat for the [grizzly bear]" and that "[e]xploration and development proposals may be limited, or modifications required, if activity is planned within the habitat boundaries of [the grizzly.]" Pls.' Mot. Ex. 11. The two Forest leases each contain a notice explaining that

> "[the Forest Service] is responsible for assuring that the leased land is examined prior to undertaking any surface-disturbing activities to determine effects upon any [endangered or threatened species or habitat]. The findings of this examination may result in some restrictions to the operator's plans or even disallow use and occupancy that would be in violation of the [ESA] by detrimentally affecting endangered or threatened species or their habitats."

Pls.' Mot. Ex. 14. Each of the Forest leases also contains a separate notice stating that "[the Forest Service] is responsible for ensuring [that] the effects of any proposed actions are not likely to jeopardize the continued existence of threatened or endangered species or adversely modify their critical habitat prior to authorizing such activities. This is accomplished by an analysis of proposed actions on leased lands through a biological evaluation prior to undertaking any surface disturbing activities. The analysis will determine the effects on any plan or animal species listed or proposed for listing as endangered or threatened. The findings of this biological evaluation and/or subsequent biological opinion from the [FWS] may result in some restrictions to the operator's plans or even disallow use and occupancy that would be in violation of the [ESA] by jeopardizing the continued existence of such species or adversely modifying their critical habitat." *Id.* The leases identify the grizzly bear as a species known or reasonably expected to occur within the lease parcel. *Id.*

and prudent measures" suggested by the FWS pursuant to a "no jeopardy" determination, and those FWS conservation recommendations that the defendants adopt as part of their conservation program. 16 U.S.C. § 1536(b)(3)(A), (4)(ii); 43 C.F.R. § 3101.1–2; 50 C.F.R. § 402.14(j); Defs.' Reply at 11–16. Finally, the third reservation allows the BLM to make modifications to the siting and timing of surface-disturbing activities to promote species protection. 43 C.F.R. § 3101.1–2.

More hurdles await the lessee hoping to conduct oil and gas operations. Before the lessee may disturb the surface of the lease parcel, he must submit an APD and a SUPO to the BLM for the agency's approval, modification, or disapproval. 43 C.F.R. § 3162.3–1(d), (h). Before it may approve the APD, the BLM (or for forest lands, the Forest Service) first must approve the SUPO. 30 U.S.C. § 226(g); 36 C.F.R. §§ 228.106–.108; 43 C.F.R. § 3162.3–1(h). Moreover, the agencies must verify that leasing on the applicant's parcel has been adequately addressed in a NEPA document. 36 C.F.R. § 228.102(e); Defs.' Reply at 17 (citing Defs.' Mot. Ex. 15). And for forest lands, the Forest Service must initiate formal consultation with the FWS. Pls.' Mot. Ex. 7; Defs.' Mot. at 30.

Taken together, these reservations and procedural hurdles demonstrate that while the lessee clearly has a legal right to apply for permission to conduct oil and gas operations, his right to development of the lease parcel is far from certain. As the Forest Service noted in its Record of Decision, "there is great uncertainty as to whether, when, and where a well would be drilled on a lease." [11] Pls.' Mot. Ex. 9. Because lease development is so uncertain at the lease issuance stage, the plaintiffs' claims "rest[ ] upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Atl. States*, 325 F.3d at 284. Nor would withholding court consideration at lease issuance cause the plaintiffs hardship, as no development may take place until the APD stage, if at all. *Id.*

The plaintiffs point to case law, including *Wyoming II*, that identifies lease issuance as the point at which there is "an irreversible and irretrievable commitment of resources" that triggers NEPA's EIS requirement. *E.g.*, Pls.' Mot. at 18 n. 6; Pls.' Reply & Opp'n at 31–34 (citing, *inter alia*, *Wyoming II*, 165 F.3d 43; *Sierra Club v. Peterson*, 717 F.2d 1409 (D.C.Cir. 1983); *Conner v. Burford*, 848 F.2d 1441 (9th Cir.1988)). On that basis, the *Wyoming II* court concluded that the plaintiffs' NEPA claim (which the plaintiffs had raised prior to lease issuance) was not ripe. *Wyoming II*, 165 F.3d at 50. The court agrees that *Wyoming II* provides critical guidance, albeit in a NEPA context, for the instant case. In both *Wyoming II* and *Peterson*, however, our court of appeals based its irreversible-commitment finding on the fact that the agency had chosen not to retain its authority to

---

11. The defendants note that only a small percentage of lease parcels contain wells. Defs.' Mot. at 28. According to the *1992 FEIS*, [a]reas have been leased on the [Shoshone] Forest under Bureau of Land Management (BLM) authority for over 30 years. There are currently 161 areas, or parcels (150,534 acres, as of September 1992), that are under lease. Only 31 exploratory wells have been drilled over the past 36 years. Only one well has ever been developed; it produced 197 barrels before being shut down. Pls.' Mot. Ex. 12. The *1995 Record of Decision* explains this paucity of wells by noting that "[e]xploration for oil and gas resources is costly and speculative, requiring long-term planning by many loosely associated, mutually-dependent industries." *Id.* Ex. 9. Thus, "whether, when, or where any well would be drilled on [a] lease is unknown." *Id.*

preclude all surface-disturbing activities after lease issuance. *Id.* at 49–50; *Peterson,* 717 F.2d at 1414–15 & n. 7 (noting, in the pre-FOOGLRA context, that the government had admitted that it did not have the authority to deny APDs). In this case, the defendants have retained the authority post-lease issuance "to condition, and even to deny, a lessee the use of the leased property if required by the ESA." Defs.' Reply at 22 (indicating that "oil and gas operations cannot occur on a lease until BLM and the Forest Service approve a specific proposal at the APD stage"). The court is reluctant to convert the "flexible" ripeness doctrine into a *per se* rule requiring that the irreversible commitment of resources—and thus, presumably, ripeness—in oil and gas leasing cases occurs at the point of lease issuance. *Am. Fed'n of Gov't Employees, AFL–CIO v. O'Connor,* 747 F.2d 748, 758 (D.C.Cir.1984) (Mikva, J., dissenting). Accordingly, the court concludes that the plaintiffs' failure-to-initiate claims are not ripe.[12] *Ohio Forestry,* 523 U.S. at 733, 118 S.Ct. 1665; *Atl. States,* 325 F.3d at 284; *Wyoming II,* 165 F.3d at 48.

### E. The Court Grants Summary Judgment for the Defendants on the Plaintiffs' Claim That the Defendants Failed to Reinitiate Consultation [13]

#### 1. The Parties' Arguments

The plaintiffs also claim that the Forest Service has violated the ESA by failing to reinitiate formal consultation with the FWS upon receipt of new information that the 1993 Biological Opinion did not take into consideration. Pls.' Mot. at 34. Pointing to a 1994 report on Yellowstone Ecosystem grizzly bear habitat, a 1997 letter from the acting field supervisor of the FWS Wyoming State Office to the district ranger of the Shoshone National Forest, and a 2001 biological assessment for a proposed exploratory well, the plaintiffs assert that data compiled since 1993 confirms the Brent Creek area's "crucial importance" to grizzlies. *Id.* at 36 (citing Pls.' Mot. Exs. 3–6). The plaintiffs believe that the new information demonstrates that leasing in the Brent Creek area will affect many more grizzly bears and much more crucial bear habitat than the defendants understood in 1993. *Id.* at 36. Accordingly, the plaintiffs maintain that because the Forest Service may no longer rely on the 1993 Biological Opinion to ensure grizzly protection, it should reinitiate formal consultation with the FWS to obtain a revised biological opinion. *Id.* at 34, 36–37.

In response, the defendants state that reinitiation of consultation is neither required by law nor useful for any practical purpose. Defs.' Mot. at 31. The defendants note that ESA regulations make clear that only new information showing that the action may affect the species "in a manner or to an extent not previously considered" can trigger reinitiation of consultation. *Id.* at 32 (citing 50 C.F.R. § 402.16(b)). According to the defendants, much of the plaintiffs' information was available to and used by the FWS in formulating its 1993 Biological Opinion. *Id.*

12. To the extent that the court's previous opinion requires clarification on this point, the court's opinion today—which provides a more in-depth analysis—so provides.

13. In this administrative-review case, the parties agree that there are no disputed material facts. Pls.' Mot. at 1–2; Defs.' Mot. at 1.

Accordingly, because the pleadings "show that there is no genuine issue as to any material fact and that the [parties are] entitled to a judgment as a matter of law," summary judgment is appropriate. FED.R.CIV.P. 56(c); *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548; *Diamond,* 43 F.3d at 1540.

The defendants contend that because the 1993 Biological Opinion indicates an awareness of grizzly use of the Brent Creek area, the potential value of the habitat, and the fact that more bears than those identified might be using the area, the new information merely helps confirm the importance of the area and does not trigger reinitiation. *Id.* at 32–33 (citing Pls.' Mot. Exs. 4, 7; Defs.' Mot. Ex. 12). Finally, given the agencies' awareness of the grizzly bear's status, the agreement between the agencies that the Forest Service will consult at the APD stage, and the defendants' ability to restrict or deny use of lease parcels, the defendants argue that reinitiation would serve no purpose. *Id.* at 34 (citing 43 C.F.R. § 3101.1–2; Pls.' Mot. Ex. 7).

## 2. The Plaintiffs' Claim Is Ripe

■ At the outset, the court notes that the plaintiffs' claim that the Forest Service failed to reinitiate consultation is ripe. In contrast to the plaintiffs' failure-to-initiate claims, the plaintiffs' failure-to-reinitiate claim is linked to the existence of new information, rather than to a particular stage in the leasing process. *Id.* at 34–37. The Forest Service has acknowledged the information but has declined to reinitiate consultation. *Id.* Ex. 17. There are no future contingent events and the dispute therefore is fit for judicial review. *Ohio*

*Forestry,* 523 U.S. at 733, 118 S.Ct. 1665; *Atl. States,* 325 F.3d at 284; *Wyoming II,* 165 F.3d at 48.

## 3. The Forest Service's Failure to Reinitiate Formal Consultation Was Not Arbitrary or Capricious [14]

■ Because the Forest Service has articulated an explanation establishing a rational connection between the facts found and the choice made, the court concludes that the Forest Service's failure to reinitiate formal consultation does not rise to the level of "arbitrary or capricious" under the APA. 5 U.S.C. § 706; *Bowen,* 476 U.S. at 626, 106 S.Ct. 2101; *Tourus Records,* 259 F.3d at 736. Under the FWS regulations implementing the ESA, both the Forest Service and the FWS are under a duty to reinitiate formal consultation if new information "reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered." [15] 50 C.F.R. § 402.16; *see also* 51 Fed.Reg. 19,926, 19,956 (noting that even if the FWS does not have authority to require reinitiation, it must request reinitiation when it believes it is warranted).

In this case, the Forest Service reasonably determined that the information cited by the plaintiffs does not trigger reinitia-

14. The plaintiffs indicate that they bring this claim against the Forest Service and not the BLM because "unlike the Forest Service, the BLM has acknowledged that new information concerning the importance of the Brent Creek area to grizzly bears warrants reinitiation of formal consultation on its programmatic oil and gas leasing plan for the area." Pls.' Mot. at 34 n. 10 (citing Pls.' Mot. Ex. 21). The defendants note that the biological opinion for the Lander Resource Area was completed in 1986, before the biological opinion for the Shoshone was completed and at a time when the FWS agreed there were no bears in the Lander area. *Id.* Ex. 17. "Therefore, in 1998, BLM independently determined that for

the BLM lands at issue, which were not covered by the Forest Service's [biological opinion], new information exists regarding BLM lands that requires reinitiation of consultation, and BLM has not and will not lease any lands in the Dubois Unit until that consultation has been completed." *Id.*

15. The court affords no special deference to the Forest Service's interpretation of the FWS regulations, as courts "do not generally accord deference to one agency's interpretation of a regulation issued and administered by another agency." *Sec'y of Labor v. Excel Mining, LLC,* 334 F.3d 1, 7 (D.C.Cir.2003).

tion. The plaintiffs stress that "oil and gas development will affect many more grizzly bears than was known in 1993" and that "there is not one word in the 1993 Biological Opinion to indicate that the rarity and importance of the Brent Creek area's spring grizzly bear habitat was understood by FWS at that time." Pls.' Reply & Opp'n at 28–29. But the Forest Service states that it and the FWS were "well aware of the importance of the area to the grizzly bear during the analysis, consultation, and decision making process," and that "[t]he information [the plaintiffs] cite has simply helped to confirm the previously recognized importance of these areas to grizzly bears." Defs.' Mot. at 33 & Ex. 12 at 3–4, 6; *accord Gerber v. Babbitt,* 146 F.Supp.2d 1, 5 (D.D.C.2001) (concluding that information regarding development of a subdivision near a fox-squirrel mitigation site did not trigger reinitiation because the FWS knew of the development), *rev'd on other grounds,* 294 F.3d 173 (D.C.Cir. 2002). The Forest Service persuasively argues that 1993 Biological Opinion recognized and took into account the uncertainties as to the size of the grizzly population and the potential value of the habitat. *Id.* at 32; *see, e.g.,* Pls.' Mot. Ex. 7 at 10 (noting that "[t]he exact size of the [Yellowstone] grizzly bear population is unknown as the very nature of the species and the rugged terrain it inhabits makes any census extremely difficult"), 34 (stating that "[e]vidence indicates that the habitat north of Wyoming Highway 26/287 on the Wind River Ranger District is valuable"); *accord Loggerhead Turtle v. County Council,* 120 F.Supp.2d 1005, 1025 (M.D.Fla.2000) (noting that the plaintiffs had not shown that new sea turtle nesting data revealed effects that were different or more extensive than those that the FWS had already considered).

In addition, there is nothing in the record showing that the FWS requested reinitiation or otherwise disagrees with the Forest Service's determination that the plaintiffs' information does not trigger reinitiation.[16] *E.g., Hawksbill Sea Turtle v. Fed. Emergency Mgmt. Agency,* 11 F.Supp.2d 529, 550 (D.Virgin Islands 1998) (finding that FEMA did not have to reinitiate consultation regarding an extension of a temporary hurricane housing project in part because the FWS never requested reinitiation); *cf. Sierra Club v. Marsh,* 816 F.2d 1376, 1388 (9th Cir.1987) (concluding that the Corps of Engineers should have reinitiated consultation after a breach of a mitigation agreement in part because the FWS requested reinitiation). Given its independent duty to request reinitiation when warranted, the FWS presumably will speak up if conditions requiring reinitiation arise.[17] 50 C.F.R. § 402.16. Accord-

16. The parties dispute the meaning of a June 1998 letter written by the supervisor of the FWS Wyoming Field Office to the supervisor of the Shoshone National Forest in response to her letter:

Your letter states that there is no significant new information that warrants re-initiation of consultation on the grizzly bear ... Based on its findings, the Forest Service is not required to consult or confer with the [FWS] on [the grizzly bear]. However, I appreciate you keeping us apprised of your determinations regarding compliance with the consultation requirements of the [ESA].

Defs.' Mot. Ex. 6 at 1. The defendants point to this passage as proof that the FWS concurs that reinitiation is unnecessary. *Id.* at 33. The plaintiffs argue that the letter merely observes the contents of the forest supervisor's prior letter and is not an independent assessment of whether the new information warrants reinitiation. Pls.' Reply & Opp'n at 29–30. More telling than this letter, however, is the fact that the FWS, which has an independent duty to request reinitiation where warranted, has not done so. 50 C.F.R. § 402.16.

17. Under the terms of the 1993 Biological Opinion, the Forest Service must reinitiate consultation upon submission of an APD and SUPO. Pls.' Ex. 7 at 27.

ingly, the court concludes that the Forest Service's explanation provides a rational basis for its decision not to reinitiate consultation and is neither arbitrary nor capricious. *Bowen*, 476 U.S. at 626, 106 S.Ct. 2101; *Tourus Records*, 259 F.3d at 736. The court therefore grants the defendants' motion for summary judgment and denies the plaintiffs' motion for summary judgment. FED.R.CIV.P. 56(c); *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548; *Diamond*, 43 F.3d at 1540.

## IV. CONCLUSION

For the foregoing reasons, the court grants the defendants' motion for summary judgment and denies the plaintiffs' motion for summary judgment. An order consistent with this Memorandum Opinion is separately and contemporaneously issued this 30th day of September, 2003.